**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Lord Osunfarian Xodus, | ) | |
| | ) | |
| Plaintiff, | ) | No.   07 C 1431 |
| v. | ) | |
| | ) | Judge Bucklo |
| The Wackenhut Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**XODUS' MEMORANDUM IN RESPONSE TO WACKENHUT'S
MOTION FOR SUMMARY JUDGMENT**

Defendant's strategy on summary judgment (and throughout this case thus far) can accurately be described as follows: "If the facts are against you, argue the law. If the law is against you, argue the facts. *If the law and the facts are against you, pound the table and yell like hell.*"

Wackenhut often refuses to acknowledge there are factual disputes and simply asks the Court to apply Wackenhut's "interpretation" of the law to Wackenhut's preferred "facts."  In his Response to Defendant's Statement of "Undisputed" Facts, Xodus has denied many of Wackenhut's "undisputed" facts.

In addition to making things up (such as Xodus' alleged admissions on a variety of issues), Wackenhut sometimes admits and denies the *same* facts.  For example, in the first part of ¶ 30 of Wackenhut's Statement Of "Undisputed" Facts, and on pages 2 (fourth sentence of the first full paragraph) and 8 (second sentence of the third paragraph) of Wackenhut's Memorandum, Wackenhut admits that Xodus mentioned "religious reasons, "religious purposes," and "religious practices" relating to his dreadlocks, during his job interview.  But what Wackenhut giveth, Wackenhut taketh away.  On pages 7 (first sentence of the first paragraph), 10 (first sentence of the second paragraph), and 11 (first sentence and fourth sentence of the first full paragraph) of its Memorandum, Wackenhut insists that Xodus did not mention his "religious practice," "religious beliefs," or "religious practices" during his job interview.  Wackenhut even manages to combine both positions in the same paragraph. In the first paragraph on page 8 of its Memorandum, Wackenhut states, "Plaintiff claims he told McCuller he wore dreadlocks for 'religious purposes.' … Such a vague reference to 'religion' fails, as a matter of law, to place Wackenhut on notice that Plaintiff's *religion* – and not simply his unorthodox hairstyle – conflicted with Wackenhut's Grooming policy."  (Emphasis in original.)

At a previous status, this Court had discouraged Wackenhut from filing a Motion For Summary Judgment on issues that were factually disputed, but Wackenhut has disregarded the Court's suggestion. The same situation arose in <u>Farrow v. Humana Health Plan, Inc.</u>, 69 F. Supp. 2d 1050, 1063 (N.D. Ill. 1999), where Judge Shadur concluded as follows:

> Now that this Court has examined the parties' submissions and the evidence from the proper perspective--one that credits Farrow's version (with the required reasonable inferences) rather than Humana's--it has confirmed that from any objective viewpoint this case should never have been the subject of a summary judgment motion, chock-full as it is of genuine issues of material fact. This Court's own opportunity costs are of course nonrecoverable. But if it were to turn out that Farrow's counsel, having been forced to engage in this extra effort rather than proceeding to trial, were to lose at trial (when, unlike the current situation, credibility determinations will be called for), this Court would be compelled to give very serious consideration indeed to implementing the caveat quoted above pursuant to 28 U.S.C. § 1927. In that event it would be left to Humana and its counsel to determine where the burden of that sanction would fall as between themselves.

On the law, Wackenhut has created new requirements for the religious accommodation prima facie case. Wackenhut also shifts the accommodation burden from the employer to the employee. And Wackenhut misrepresents the holdings of various cases.

## **SUMMARY JUDGMENT STANDARD**

The defendants' burden on summary judgment was set out in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986):
[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.
477 U.S. at 323. Defendants have interpreted <u>Celotex</u> to require that they identify only those portions of the record which support their position on summary judgment, although there exists evidence to the contrary of which defendants are aware. Defendants maintain that the burden of producing such evidence was on Goka as the party opposing summary judgment, and that he failed to meet that burden. They conclude, therefore, that summary judgment was appropriate. We do not agree.
Defendants' argument ignores the principal purpose of the summary judgment rule which is "to isolate and dispose of factually unsupported claims or defenses." <u>Celotex</u>, 477 U.S. at 323-24. When a party has obtained knowledge through the course of discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in responding to the motion, he defeats that purpose; and, more importantly, violates the rules of procedure which govern the conduct of trial, specifically Rule 11.
Fed. R. Civ. P. 11 requires that every pleading and motion of a party represented by an attorney be signed by that attorney, certifying: that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law . . . and that it is not interposed for any improper purpose. . . .(Emphasis added). It also provides that appropriate sanctions shall be imposed if its provisions are violated.

Goka v. Bobbitt, 862 F.2d 646, 650 (7th Cir. 1988).

## ARGUMENT[1]

### A. Wackenhut Was On Notice During The EEOC Investigation That Xodus Had Alleged A Denial Of Religious Accommodation

In its Memorandum, Wackenhut argues that, prior to discovery in this case, it did not have notice that Xodus was alleging a denial of religious accommodation.

A plaintiff must give a defendant and the EEOC notice of claims during the EEOC process, so the EEOC has an opportunity to investigate and conciliate those claims. Novitsky v. American Consulting Eng'rs, L.L.C., 196 F.3d 699, 701-702 (7th Cir. 1999). "This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." Cheek v. Western & S. Life Ins. Co., 31 F.3d 497, 501 (7th Cir. 1994). "All claims of discrimination are cognizable that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.' [Citations omitted.] The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions." Babrocky v. Jewel Food Co., 773 F.2d 857, 864 (7th Cir. 1985). "Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations." Cheek v. Western & S. Life Ins. Co., 31 F.3d 497, 502 (7th Cir. 1994).

During the EEOC investigation, Wackenhut was clearly on notice of Xodus' religious accommodation claim and investigated that claim, and the EEOC clearly investigated and tried to conciliate Xodus' religious accommodation claim. The allegations investigated by the EEOC were the same allegations made in Xodus' lawsuit.

On November 4, 2004, Xodus went to EEOC without an attorney. He filled out an EEOC charge questionnaire "under penalty of perjury" stating that Wackenhut "wouldn't hire for employment" because "I wouldn't cut off dreadlocks" and "I explained I had my dreadlocks for religious purposes." Xodus submitted this information to the EEOC. (¶ 1)[2] That same day, the EEOC interviewed Xodus after he filled out the EEOC questionnaire. In the interview notes, the EEOC wrote down, "wouldn't cut dreadlocks b/c of relig reasons" and "R[espondent]: wouldn't be able to hire you for the same reason. CPs [charging party's] unwillingness to cut dreadlocks" and "accordg to relig

---

[1] Xodus incorporates by reference his contemporaneously filed Statement Of Additional Undisputed Material Facts.

[2] "(¶ __)" refers to the facts in Xodus' Statement Of Additional Undisputed Facts.

3

beliefs can't cut hair." (¶ 2) Based on Xodus' EEOC charge questionnaire and the EEOC interview, the EEOC drafted an EEOC charge for Xodus alleging hiring discrimination on the basis of religion.[3] Xodus believed that the EEOC employees whom he dealt with were experts on drafting EEOC charges. (¶ 3)

The EEOC then researched the law of religious accommodation and placed the results of the research into Xodus' EEOC file. (¶ 4)

After receiving Xodus' EEOC charge, Wackenhut conducted an investigation into Xodus' religious accommodation allegations. As part of the investigation, Clarence McCuller sent Joe Krol an email providing McCuller's version of the interview: "Mr. Xodus stated he would not cut his hair that it was against his belief." (¶ 5) Wackenhut then produced an investigation report stating, "At no time did Mr. Xodus inform Clarence of his religious affiliations or beliefs that prohibits Mr. Xodus from adhering to Wackenhut's standards of appearance for Security Officers." (¶ 6)

Wackenhut then provided the EEOC with a position statement stating "at no time during his interview did Mr. Xodus claim that he had a sincerely held religious belief that required him to wear his hair in this fashion…" (¶ 7)

Pattie Marmon, Wackenhut's Director of EEO and Affirmative Action Programs, who investigated Xodus' EEOC charge and prepared Wackenhut's position statement to the EEOC, testified that when she submitted Wackenhut's position statement to the EEOC, she understood that

---

[3] Xodus' EEOC charge was legally sufficient because, under Title VII, the term "religion" incorporates "religious accommodation" by definition. "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). "Title VII provides that it is unlawful to refuse to hire or promote 'any individual … because of such individual's … religion …' 42 U.S.C. § 2000e-2. Because some religious practices may be incompatible with performance of the job at hand, however, Title VII limits this proscription by *defining religion in an unconventional way*: (j) The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e(j)." EEOC v. UPS, 94 F.3d 314, 317 (7th Cir. 1996) (emphasis added). The Seventh Circuit regularly refers to denials of religious accommodation as "religious discrimination." For example, "Most of the reported cases discussing '*religious discrimination*' under Title VII involve situations where either Sabbatarianism or a practice specifically mandated or prohibited by a tenet of the plaintiff's religion is involved." Redmond v. GAF Corp., 574 F.2d 897, 900 (7th Cir. 1978) (emphasis added). Another example: "An individual alleging *religious discrimination* must ordinarily show that: (1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the employer's attention, and (3) the religious practice was the basis for the adverse employment decision... The employer may respond to the prima facie case either by proving that it was unable to provide a reasonable accommodation without undue hardship or that it offered a reasonable accommodation which was not accepted by the employee." EEOC v. UPS, 94 F.3d 314, 317-318 (7th Cir. 1996) (emphasis added).

4

Xodus was alleging that he had been denied a religious accommodation, and it was her intention to argue that Mr. Xodus had not requested a religious accommodation. (¶ 8)

After the EEOC informed Xodus about Wackenhut's position on the religious accommodation issue, Xodus provided the EEOC with a rebuttal letter stating, "Mr. Xodus explained that he wore dreadlocks for religious reasons, and asked if he could keep his dreadlocks on the job. The interviewer said Mr. Xodus could not be hired with dreadlocks." (¶ 9)

The EEOC attempted to conciliate Xodus' religious accommodation complaint; in response, Wackenhut wrote to the EEOC making a counter-offer and stating, "Mr. Xodus never communicated that he had strongly held religious beliefs that required an accommodation." (¶ 10)

Xodus and Wackenhut then exchanged pre-lawsuit communications regarding Xodus' religious accommodation claims. In its email to Xodus, Wackenhut stated, "Wackenhut's supervisor is very strong and convincing in his assertion that your client never brought up his religious beliefs as the reason for his hairstyle." (¶ 11)

In addition to claiming lack of notice prior to Xodus' lawsuit, Wackenhut also claims that Xodus never pled a religious accommodation claim in his lawsuit. But Xodus' lawsuit clearly alleges, "15. Mr. McCuller told Plaintiff that Defendant did not allow security guards to wear dreadlocks. 16. Plaintiff explained that his religious beliefs prohibited him from cutting his hair, and required him to wear his hair in dreadlocks. 17. Mr. McCuller terminated the interview and denied Plaintiff the job for failure to comply with Defendant's appearance standards." (¶ 12)

Wackenhut cites cases that bear no similarity to the present case. All the cases cited by Wackenhut involve situations where the plaintiffs had multiple claims, and they mentioned some (but not all) of their claims in their EEOC charges. In those cases, the EEOC did not investigate the claims left out of the EEOC charges, and the defendants were not on notice of those claims during the EEOC investigation. Then the plaintiffs filed lawsuits regarding the claims in their EEOC charges plus additional Title VII claims which implicated different individuals and/or different conduct from the allegations in the EEOC charges. In those cases, courts dismissed the Title VII claims that had been left out of the EEOC charges. As shown above, Xodus' situation is completely different.

In light of all the evidence that Wackenhut was on notice that Xodus was alleging a denial of religious accommodation, Wackenhut's motion for summary judgment on this issue is improper.

**B.     Xodus Has Made Out A Prima Facie Case Of Denial Of Religious Accommodation**

Wackenhut claims that Xodus has not made out a prima facie case.

5

"An individual alleging religious discrimination must ordinarily show that: (1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the employer's attention, and (3) the religious practice was the basis for the adverse employment decision." EEOC v. UPS, 94 F.3d 314, 317 (7th Cir. 1996). Xodus has established a prima facie case.

### i. Xodus Has Established The First Prong Of The Prima Facie Case

As a Rastafarian/Hebrew Israelite, Xodus' sincerely-held religious beliefs prohibit him from cutting his hair and require him to wear his hair in dreadlocks.[4] (¶ 13) Furthermore, Wackenhut's Appearance Policy required short hair for male officers; men's hair had to be neatly combed, and hair length could not extend beyond the shirt collar; male officers were not permitted to have dreadlocks, regardless of length. (¶ 14) Wackenhut told Xodus he had to cut off his dreadlocks to work for Wackenhut. (Wackenhut concedes this in the first part of ¶ 30 of Wackenhut's Statement Of "Undisputed" Facts.)

### ii. Xodus Has Established The Second Prong Of The Prima Facie Case

Xodus brought the religious practice to Wackenhut's attention; Xodus informed McCuller during the interview that he wore his dreadlocks for religious reasons. (Wackenhut concedes this in the first part of ¶ 30 of Wackenhut's Statement Of "Undisputed" Facts.)

Beyond the legal requirement of bringing the religious practice to the employer's attention, Wackenhut claims that Xodus was required to mention <u>the name of his religion</u> during the interview in order to establish a prima facie case, but Wackenhut provides no authority for this "new element" of

---

[4] Wackenhut addresses the issue of Xodus' sincerely held belief in footnote 3 of its Memorandum. Wackenhut states that "Hebrew Israelites are not required to wear dreadlocks." To support this "fact," Wackenhut cites to ¶ 34 of it Statement of Facts, which has absolutely nothing to do with dreadlocks or Hebrew Israelites. As is often the case, there is no support in the record for Wackenhut's "fact." (Furthermore, Wackenhut doesn't even attempt to deny that Rastafarians are required to wear dreadlocks.)

In the same footnote, Wackenhut cites to Sistrunk v. Camden County Workforce Inv. Bd., 2007 U.S. Dist. LEXIS 28854 (D. N.J. 2007), where the Court denied the defendant's motion for summary judgment on Title VII religious accommodation claims when a Rastafarian refused to cut his dreadlocks, even though his job required "extensive contact with parole officers, judges, members of the prosecutor's office, youth and parents." Id. at *2. The Court stated, "To ascertain whether an activity qualifies as the kind of religious belief that merits accommodation, courts look to 'whether the beliefs professed by a claimant are sincerely held and whether they are, in his own scheme of things religious.' [Citations omitted.] Summary judgment is seldom appropriate in subjective inquiries and, in religious accommodation cases such as this, should be granted only where '[o]n the record before the Court, a reasonable jury could only conclude that [the employee's] religious assertion was not bona fide.'" Id. at *12. In Sistrunk, the Court found, "Plaintiff presented sufficient evidence to satisfy the first prong of the prima facie test. Specifically, Plaintiff allegedly believed that he was required to either cut his hair or lose his employment with Defendant. Since Plaintiff contends that the manner in which he wore his hair was a result of his religious beliefs and practices, Plaintiff possessed the sincere religious belief sufficient for this prong of the analysis." Id. at *12-13. Similarly, Xodus satisfies the first prong, because he wore dreadlocks for religious reasons.

6

the religious accommodation prima facie case. This might be a requirement in religious disparate treatment cases, but none of the cases cited by Wackenhut suggest any need to mention the name of the religion in a religious accommodation case.

The Seventh Circuit has held that an employer was on sufficient notice of the religious nature of an employee's request for time off when the employee used the phrase "religious obligation."

> In this connection, we now deal with defendant's claim that plaintiff failed to provide sufficient information to put it on notice of his religious needs and thus to permit an accommodation… While there is a paucity of information in the record regarding this period of time, when the conflict finally reached a climax in early August, Mr. Redmond testified, without contradiction, that he told his supervisor, Hampton, 'I thought we had discussed this several times before, that I was not able to work on Saturday *because of my religious obligation*.' The following day during the meeting with Hampton and Svatos, Mr. Redmond stated, 'I've talked with you and Mr. Hampton several times before about the matter of Saturday work . . . .' I thought we had an understanding as to why I was not able to come to work on Saturday . . . . I cannot work Saturdays . . . . I have a *religious obligation*.' … Whatever confusion or misunderstanding that may have existed prior to this time as to the reasons for Mr. Redmond's inability to work on Saturday, they were clearly eliminated during this meeting.

Redmond v. GAF Corp., 574 F.2d 897, 902 (7th Cir. 1978) (emphasis added). The Seventh Circuit did not require Mr. Redmond to specify his religion without a request for such information from GAF Corp.

Wackenhut did not ask for more details about Xodus' religion or religious needs. Xodus would have provided more information if Wackenhut had requested it. But Wackenhut simply terminated the interview when Xodus stated he could not comply with the grooming policy for religious reasons. (¶ 15) Employees cannot be penalized for an employer's decision to end the religious accommodation discussion.

### iii. Xodus Has Established The Third Prong Of The Prima Facie Case

Wackenhut denied Xodus the job because of his dreadlocks. (Wackenhut concedes this at ¶¶ 30 and 32 of Wackenhut's Statement Of "Undisputed" Facts.)

Wackenhut argues that it has asked other applicants to cut their hair, and those applicants complied. This may be relevant in a disparate impact case, but it is irrelevant here, because there is no comparator requirement to establish a religious accommodation prima facie case.

Next, Wackenhut cites EEOC v. UPS, 94 F.3d 314, 318 n. 3 (7th Cir. 1996) for the purpose of arguing that Xodus must establish that Wackenhut "consciously" failed to make an accommodation. However, in the same footnote cited by Wackenhut, EEOC v. UPS makes clear that this requirement is met by establishing a prima facie case: "Though the employer bears the burden of proving that it was unable to reasonably accommodate without undue hardship, the employee, in the prima facie case,

7

must show that the employer consciously failed to make an accommodation. In this respect, these cases are somewhat analogous to 'disparate treatment' cases, which require proof of intent. Whether the *prima facie proof of conscious failure to accommodate* can be provided by something – such as a categorical policy of non-accommodation – other than *the usual showing that the employer was notified of the employee's religious practice (and failed to reasonably accommodate it)* need not be resolved here." EEOC v. UPS, 94 F.3d 314, 318 n. 3 (7th Cir. 1996) (emphasis added).

Therefore, Xodus has established a prima facie case for a religious accommodation claim.[5] In light of all of Wackenhut's factual concessions regarding the prima facie case, Wackenhut's motion for summary judgment on this issue is improper. If anyone should be granted summary judgment on the prima facie case, it should be Xodus, in light of Wackenhut's factual concessions.

**C.     Wackenhut Did Not Offer A Reasonable Accommodation Or Show Undue Hardship**

"The employer may respond to the prima facie case either by proving that it was unable to provide a reasonable accommodation without undue hardship or that it offered a reasonable accommodation which was not accepted by the employee." EEOC v. UPS, 94 F.3d 314, 317-318 (7th Cir. 1996). Wackenhut has completely failed to meet its burden; Wackenhut has neither offered a reasonable accommodation, nor showed undue hardship.

**i.     Accommodating Xodus' Dreadlocks Would Not Be An Undue Burden On Wackenhut**

Wackenhut argues that accommodating Xodus would be an undue hardship. Xodus has fully briefed the issue of undue hardship in Xodus' own Motion For Summary Judgment. Here, for space reasons, Xodus will only address the arguments raised by Wackenhut.

Wackenhut cites Cloutier v. Costco Wholesale Corp., 390 F.3d 126 (1st Cir. 2004), where the First Circuit held that an employee who was unwilling to consider any accommodations other than openly displaying her religious jewelry (for example, she was unwilling to cover up her jewelry with a band-aid) was effectively asking for a complete "exemption," which created an undue hardship on

---

[5] In an effort to paint a false picture of what occurred during Xodus' job interview, Wackenhut makes up several disputed "facts." Wackenhut claims that Xodus admitted knowing that his dreadlocks did not comply with the grooming policies of security companies in general. Xodus admits knowing that security companies had appearance policies, but he denies admitting that security companies generally did not allow dreadlocks. (Xodus Tr. 212.) In fact, several security companies do allow dreadlocks. (Xodus Tr. 337-338.)

Wackenhut also claims that Plaintiff told McCuller that his former employer, Securitas, had no choice but to terminate him when he refused to cut his dreadlocks. In fact, Xodus told McCuller that Securitas said it had no option but to terminate Xodus. Furthermore, Wackenhut's claim is disputed by McCuller himself, because McCuller testified that Securitas' firing of Xodus never came up during the job interview, and McCuller testified that all Xodus said about Securitas was that he was suing Securitas. (McCuller Tr. 204-206, 215.)

8

Costco. "Still, we are faced with the similar situation of an employee *who will accept no accommodation short of an outright exemption* from a neutral dress code. Granting such an exemption would be an undue hardship because it would adversely affect the employer's public image. … Cloutier's insistence on a wholesale exemption from the no-facial-jewelry policy *precludes Costco from using its managerial discretion to search for a reasonable accommodation*. Exempting Cloutier from the dress code would have imposed more than a *de minimis* burden on Costco for the reasons outlined above. Her *refusal to consider anything less means that Costco could not offer a reasonable accommodation* without incurring an undue hardship." Id. at 136, 138 (emphasis added).

In contrast, Wackenhut never asked Mr. Xodus if he was willing to cover up his dreadlocks in any way. (¶ 16) However, if Wackenhut had asked Mr. Xodus to cover up his dreadlocks, he would have done it, because the Bible does not require Mr. Xodus to openly display his dreadlocks. If Wackenhut had asked him to wear a cap, he would have done it. If Wackenhut had asked him to tuck his dreadlocks into his shirt collar so the dreadlocks would not be visible, he would have done it. If Wackenhut had asked him to pull his dreadlocks up above his shirt collar and put his dreadlocks in a bun, he would have done it. If Wackenhut had asked him to pull his dreadlocks up above his shirt collar and cover his dreadlocks with a cloth, he would have done it. If Wackenhut had asked him to pull his dreadlocks up above his shirt collar and cover his dreadlocks with a turban, he would have done it. He would have covered his hair with any safe covering that Wackenhut might have proposed.[6] (¶ 17)

Next, Wackenhut "mistakenly" cites Booth v. Maryland, 327 F.3d 377 (4th Cir. 2003) as "affirming summary judgment in religious accommodation claim where grooming policy adopted for the neutral secular purposes of promoting public safety, discipline and *esprit de corps*)." (See the last sentence on page 9 of Wackenhut's Memorandum.) In fact, the Fourth Circuit *denied* the State of Maryland's motion for summary judgment on religious accommodation claims when a Rastafarian uniformed correctional officer refused to cut his dreadlocks, even though Maryland claimed that the short hair requirement for correctional officers was "related to the Division's goals of promoting safety, uniformity, discipline, and esprit de corps among the correctional staff at the facility." Id. at 381.

---

[6] Wackenhut makes up several disputed "facts" that it uses to claim that Xodus made various admissions at his deposition regarding undue hardship. Wackenhut claims that, at his deposition, "Plaintiff concedes that Wackenhut's clients could refuse to let Plaintiff work if he were not in compliance with the grooming policy (Facts ¶ 9-10); Plaintiff conceded that such a refusal would require Wackenhut to find a replacement for him, thereby incurring overtime and other costs (Facts ¶ 11); and such an exemption from the grooming policy could impact Wackenhut's ability to present a professional image, (Facts ¶ 4, 5, 10-11)." Xodus has denied these "facts" in Xodus' Response to Defendant's Statement of "Undisputed" Facts.

9

Subsequently, Maryland agreed to allow Correctional Officer Booth to wear dreadlocks. Booth v. Md. Dep't of Pub. Safety & Corr. Servs., 2006 U.S. Dist. LEXIS 49313, *28 n. 10 (D. MD. 2006).

### ii.     Wackenhut Never Offered Xodus A Reasonable Accommodation

Wackenhut blames Xodus for Wackenhut's failure to accommodate him. After arguing that all accommodations would have caused an undue hardship, Wackenhut states that, during the job interview, McCuller "did suggest a reasonable accommodation… McCuller suggested a dock position to Plaintiff … McCuller told Plaintiff that no such positions were currently available." (By the way, this is a disputed fact, because McCuller testified he never spoke to Xodus about positions at docks. See McCuller Tr. 263-264.)

In fact, as the quoted language above shows, Wackenhut did not offer Xodus a position at a dock. McCuller did not say that Xodus could have a position at a dock when such a position opened up. McCuller did not say he would let Xodus know when a dock position was available. All McCuller said was that there were no dock positions available, and that he could not offer Xodus employment. While McCuller was Manager of Physical Security, there was a lot of turnover among the Wackenhut security officers working in loading dock positions at Wackenhut's Quaker Plaza account. But, after the day of Xodus' job interview, McCuller never considered Xodus for a position when new openings came up, because Xodus had refused to cut his hair. (¶ 18) A defendant does not satisfy its duty to accommodate simply by saying that a particular accommodation is not available.

In EEOC v. UPS, 94 F.3d 314 (7th Cir. 1996), the Seventh Circuit denied UPS' motion for summary judgment where UPS told Mr. Patel that a position that would accommodate his religious needs would not be available for an undetermined period of time. "The district court found that UPS had reasonably accommodated Patel by offering him a full-time inside job as a package sorter and that Patel had refused to accept the accommodation. Patel, on the other hand, contends that he was told that he faced a long wait before an inside position would be available to someone of his seniority… If Patel was told there would be a long wait for a nonpublic-contact job, he was not offered a reasonable accommodation, whether or not such a waiting list actually existed." Id. at 319-320.

Wackenhut's argument is even weaker than UPS' losing argument, because Wackenhut never even offered an accommodation that would be available sometime in the future.

Next, Wackenhut seeks to transfer the accommodation burden to Xodus by arguing that when McCuller told Xodus that no positions were available at docks, that it then became Xodus' responsibility to "suggest any other way that his religious needs could be accommodated."

10

It is a defendant's burden to offer an accommodation. "While we feel plaintiff should be free, even encouraged, to suggest to his employer possible ways of accommodating his religious needs, we see nothing in the statute to support the position that this is part of plaintiff's burden of proof." Redmond v. GAF Corp., 574 F.2d 897, 901 (7th Cir. 1978).

Wackenhut then claims that Xodus prevented a further discussion about a possible accommodation by terminating the interview and walking out on McCuller. This is a disputed "fact"; in fact, McCuller terminated the interview. (¶ 19)

Wackenhut did not offer Xodus a single accommodation. If Wackenhut had offered Xodus an actual position at a dock, or any other reasonable accommodation (like working with his dreadlocks covered), Xodus would have been working for Wackenhut for the past five years.[7]

## D.  Xodus Has Mitigated His Lost Pay Damages

Wackenhut "mistakenly" claims that the burden of proving mitigation is on Xodus. However, "Once the claimant establishes the amount of damages, the employer must demonstrate, as an affirmative defense, that the claimant failed to mitigate those damages. [Citations omitted.] We emphasize that the employer bears the burden of proving a failure to mitigate. [Citations omitted.] To prevail, the employer must prove "both that the [claimants were] not reasonably diligent in seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance that the [claimants] might have found comparable employment." United States EEOC v. Gurnee Inn Corp., 914 F.2d 815, 818 (7th Cir. 1990).

Because Wackenhut has failed to meet this burden on this issue, Xodus moves for summary judgment on the issue of mitigation.

Wackenhut does not claim that Xodus failed to seek employment. Instead, Wackenhut claims that Xodus is not entitled to lost pay because he worked "sporadically," "terminated his employment from these positions after only a very short span of time," and turned down various positions. Wackenhut further argues that it should not be liable for the effect of Xodus' health problems and hospitalizations on Xodus' ability to work.

Xodus has been limited in his ability to work because discrimination by Wackenhut aggravated his pre-existing depression. (¶ 20)

---

[7] Wackenhut cites several cases (including ADA accommodation cases) which state that the plaintiff must cooperate with the defendant's efforts to find a religious accommodation. These cases do not say that the burden shifts to the plaintiff if the defendant fails to attempt a religious accommodation. These cases are inapplicable, because Wackenhut made no attempt to accommodate Xodus.

11

Courts have held that if the defendant's discriminatory actions damaged the plaintiff's health, and if that made it difficult for the plaintiff to work, the plaintiff was entitled to lost pay.[8]

"The district court refused to toll a back pay award for the time during which Knafel was unable to work because her inability to work was caused by Pepsi. Trial courts have discretion to fashion remedies to make Title VII victims whole. Given the overwhelming evidence indicating that Pepsi exacerbated Knafel's back condition by assigning burdensome work designed to injure her, the district court's award was appropriate." Knafel v. Pepsi-Cola Bottlers, Inc., 899 F.2d 1473, 1480 (6th Cir. 1990) (granting back pay for the period of time the plaintiff was unable to work as a result of health problems caused by discrimination).

"The trial court also expressly rejected a reduction of defendant's back pay liability based on plaintiff's disability, saying: 'Here, Whatley would not have suffered his disabling back injury had Skaggs not terminated him as lobby manager. Skaggs' act of discrimination forced Whatley from his management position to blue-collar jobs that required strenuous physical labor resulting in injury to his back.'" Whatley v. Skaggs Cos., 707 F.2d 1129, 1138 n.8 (10th Cir. 1983) (granting back pay for the period of time the plaintiff was unable to work as a result of health problems caused by discrimination).

See also Cline v. General Electric Capital Auto Lease, Inc., 757 F. Supp. 923, 933 (N.D. Ill. 1991) and Griffin v. Wash. Convention Ctr., 2000 U.S. Dist. LEXIS 22713, *10-11 (D. D.C. 2000).

When his health permitted, Xodus has held security positions for extended periods of time, since the discrimination by Wackenhut. (¶ 21) Xodus held other jobs until the positions ended. (¶ 22) Xodus did turn down some positions because their schedules conflicted with his schedule at the University Of Chicago Police. Xodus chose the University Of Chicago Police position over the other positions because the University Of Chicago Police position was important for his mental health. (¶ 23) It was important for his mental health for him to work in a professional environment with a long-term future, such as the University Of Chicago Police. Xodus' therapist told him that working in the right environment was important for his mental health. In light of his experience with Wackenhut and the resulting damage to his health, Xodus was fearful of possible discrimination by new employers, and he did not want to give up a job that was good for his mental health, in exchange for a job that

---

[8] The cases cited by Wackenhut are inapplicable, because none of them involve a plaintiff who was limited in his ability to work due to health problems caused by the defendant's discrimination. Some of these cases are also distinguishable because they involve areas of law that are significantly different from Title VII (such as the FMLA, which requires the plaintiff to be able to return to work after 12 weeks of medical leave, and the ADA, which requires the plaintiff to be a "qualified individual with a disability").

might discriminate against him. Because of his mental health, he was only willing to take a full-time job whose schedule didn't conflict with his University Of Chicago Police position. Xodus would leave the University Of Chicago Police if he were offered a full-time position with a security company where he felt mentally comfortable. Alternatively, he was also looking for a second part-time job whose schedule would not conflict with his University Of Chicago Police position. Furthermore, Xodus expects to get a full-time position with the University Of Chicago Police. (¶ 24) Xodus was unable to accept one particular security position, because he was hospitalized around the time he was supposed to begin work. (¶ 25)

Ironically, after arguing that Xodus has improperly turned down too many job offers as a security officer, Wackenhut then argues that Xodus has taken himself out of the job market by applying mostly for security officer positions; Wackenhut argues that Xodus should have changed his line of work, because security forces will not hire an officer with dreadlocks. Wackenhut also suggests that Xodus has engaged in "extortion" by seeking to work as a security officer wearing dreadlocks, when he supposedly knows he won't get job offers. But "mitigation does not require a plaintiff to go into another line of work…" EEOC v. Harris Chernin, Inc., 1991 U.S. Dist. LEXIS 17124, *17 (N.D. Ill. 1991).

Furthermore, there is no evidence in the record that security companies generally do not accommodate dreadlocks. Wackenhut itself has accommodated a male security officer wearing dreadlocks. (¶ 26) Xodus has worked as a security officer for several employers which had no objections to his dreadlocks. Of the large number of security companies where he has interviewed, only six have told him that his dreadlocks violate their grooming policy, and only five maintained that position after he mentioned the religious reasons for his dreadlocks. (¶ 27)

Therefore, Xodus has not failed to mitigate his damages. Because Wackenhut has failed to meet its burden on this issue, Xodus is entitled to summary judgment on the issue of mitigation.

**E.     If Xodus Prevails On Liability, He Is Entitled To Punitive Damages As A Matter Of Law**

Wackenhut argues that Xodus cannot claim punitive damages. Because Wackenhut discriminated against Xodus with reckless indifference to Xodus' federally protected rights, and because Wackenhut did not make good faith efforts to comply with the religious accommodation provisions of Title VII, Xodus requests that this Court deny Wackenhut summary judgment and grant Xodus summary judgment on the issue of entitlement to punitive damages.

Punitive damages may be awarded where the employer engaged in a discriminatory practice with "reckless indifference to the [plaintiff's] federally protected rights." Kolstad v. American Dental

13

Ass'n., 527 U.S. 526, 535 (1999). Kolstad established a three-part framework for determining whether punitive awards were appropriate. Bruso v. United Airlines, Inc., 239 F.3d 848, 857-859 (7th Cir. 2001).

First, a plaintiff must show that "the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws." Id. at 858.

Wackenhut's written EEO policy stated, "Title VII of the Civil Rights Act of 1964 Prohibits discrimination on the basis of … religion … in hiring … Religion. It is prohibited to discriminate against an individual on the basis of religion. This includes a requirement that employers make reasonable accommodation for religious observance so long as it does not cause an undue hardship to the employer." McCuller was familiar with Wackenhut's Equal Employment Opportunity policy. McCuller was also knowledgeable about the law of religious accommodation. (¶ 28)

Second, "The plaintiff must demonstrate that the employees who discriminated against him are managerial agents acting within the scope of their employment." Id. at 858.

As Wackenhut's Manager For Physical Security, interviewing job applicants for security officer positions was a part of McCuller's job. McCuller would decide which applicants for security officer positions in the Chicago Loop would be approved for further processing. McCuller interviewed Xodus and denied him a security officer position because of Xodus' dreadlocks. (¶ 29)

Third, "Even if the plaintiff establishes that the employer's managerial agents recklessly disregarded his federally protected rights while acting within the scope of their employment, the employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy. … Every court to have addressed this issue thus far has concluded that, although the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award. Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies." Id. at 858-859.

Wackenhut did have a written religious accommodation policy (quoted above) that refers to the duty to provide religious accommodations, but Wackenhut had no written procedures to implement the policy, and Wackenhut did not train anyone in "Chicago Area" to implement the policy. (¶ 30)

A religious accommodation procedure wasn't written down because religious accommodation requests don't come up frequently at Wackenhut; Wackenhut has written procedures on accommodating individuals with disabilities, because those requests come up more often. Regarding

14

disabilities, Wackenhut's EEO policy instructs managers to "Please review HR 600 for more detail regarding those with disabilities." Furthermore, the written ADA procedure specifically instructs managers to call the corporate office if there is an accommodation issue. (¶ 31)

Furthermore, no one in Wackenhut's "Chicago Area" was trained to handle religious accommodation requests. (¶ 32)

Wackenhut's 30(b)(6) representative testified that Wackenhut relies on each local Area Manager to ensure compliance with Wackenhut's EEO policies in his local area. However, Joe Krol, who was Chicago Area Manager (July 2002 to August 2006), was not trained on Wackenhut's EEO policies. (¶ 33)

Wackenhut's EEO Policy required that, "Each Field Manager will … Appoint an Area Office or Project Equal Opportunity Officer to coordinate dissemination of the Equal Opportunity Policy to all employees, monitor adherence to the Equal Opportunity Policy…" This policy was not followed in Wackenhut's "Chicago Area." (¶ 34)

Wackenhut's EEO Policy required that, "Each Manager will … Ensure that all management/supervisory employees are advised that: (1) Equal Employment Opportunity is an integral part of their job responsibilities and part of their performance evaluation." This policy was not followed in Wackenhut's "Chicago Area." (¶ 35)

Wackenhut did not even know if its managers, including McCuller, were reading the EEO policy. (¶ 36)

In its Memorandum, Wackenhut claims that it "provides job applicants … numerous channels to report harassment or discrimination and investigates all such complaints." But there is no evidence in the record that Wackenhut provides any complaint mechanism to job applicants. McCuller did not tell Xodus how to complain. The Wackenhut job application form filled out by Xodus did not tell Xodus how to complain. (¶ 37)

Furthermore, there is no evidence in the record that Wackenhut investigates all complaints of discrimination.

Therefore, Xodus is entitled to summary judgment on the issue of punitive damages.

## IV. CONCLUSION

The record overwhelmingly establishes that Wackenhut is not entitled to summary judgment. Furthermore, Xodus is entitled to summary judgment on two of the issues raised by Wackenhut, Xodus' entitlement to back pay and punitive damages.

                                                             Respectfully Submitted,

/s/ Kamran Memon
Plaintiff's Attorney

Kamran Memon
200 S. Michigan Ave.
Suite 1240
Chicago, IL 60604
(312) 961-2354

## **CERTIFICATE OF SERVICE**

I served Xodus' Memorandum In Response To Defendant's Motion For Summary Judgment on January 30, 2009 through the Court's electronic case filing system upon:

Erin D. Foley, Esq.
Seyfarth Shaw
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577

/s/ Kamran Memon
Kamran Memon