**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| Lord Osunfarian Xodus, | ) | | |
| | ) | | |
| Plaintiff, | ) | No. | 07 C 1431 |
| v. | ) | | |
| | ) | Judge Bucklo | |
| The Wackenhut Corporation, | ) | | |
| | ) | | |
| Defendant. | ) | | |

<u>**XODUS' REPLY TO WACKENHUT'S RESPONSE**
**TO XODUS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON DEFENDANT'S DEFENSE OF UNDUE HARDSHIP**[1]</u>

In Wackenhut's Response to Xodus' Motion For Summary Judgment On Wackenhut's Defense Of Undue Hardship ("Xodus' Motion"), Wackenhut has not provided any *concrete, non-speculative evidence* that it would have been harmed by allowing Xodus to work while wearing dreadlocks. Therefore, Wackenhut has not met its burden of establishing undue hardship, so Xodus is entitled to summary judgment on the issue of undue hardship.

**TABLE OF CONTENTS**

Introduction, Page 2

Argument On Undue Hardship, Page 3

A.      Wackenhut Has Raised The Defense Of Undue Hardship, Page 3

B.      Xodus Has Not Admitted That Dreadlocks Would Cause Undue Hardship For Wackenhut, Page 4

C.      Years Before Xodus' Request For A Religious Accommodation, Wackenhut Accommodated Officer Aton's Dreadlocks Under A Garrison Hat, Page 7

D.      Wackenhut Has Admitted That Another, Unidentified Officer's Dreadlocks Did Not Cause Wackenhut Any Harm, Page 9

E.      With Wackenhut Having Taken Two Contradictory Positions Regarding The Acceptability Of Dreadlocks, This Court Should Decide Xodus' Motion Based On The Position That Is Most Favorable To Xodus, Page 11

F.      Xodus' Statement Of Facts Should Be Deemed Admitted Because of Wackenhut's Improper Responses, Page 17

G.      Xodus' Statement Of Facts Properly Supports Xodus' Motion, Page 19

Argument On Xodus' Prima Facie Case, Page 27

---

[1] Because the Court has granted Xodus leave to file a Reply brief in excess of 15 pages, this Reply brief incorporates Xodus' Reply to Wackenhut's challenges to 54 out of 70 of the Facts in Xodus' Statement of Facts ("SOF"). (Regarding Wackenhut's own Motion For Summary Judgment, Wackenhut filed a separate Reply To Xodus' Response To Wackenhut's SOF; Xodus is not filing a separate Reply To Wackenhut's Response To Xodus' SOF.)

## TABLE OF CASES

Aton v. The Wackenhut Corp., 2002 WL 32502095, (D. Md. 2002), *affirmed*, 61 Fed.Appx. 96 (4th Cir. 2002), Page 7, 8, 9, 15

Midwest Imports v. Coval, 71 F.3d 1311 (7th Cir. 1995), Page 10

Beckel v. Wal-Mart Assocs., 301 F.3d 621, 623 (7th Cir. 2002), Page 13

Smith v. Lamz, 321 F.3d 680 (7th Cir. 2003), Page 17

Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524 (7th Cir. 2000), Page 17

Adams v. City of Chicago, 469 F.3d 609, 617 (7th Cir. 2006), Page 19

EEOC v. UPS, 94 F.3d 314 (7th Cir. 1996), Page 20

ESPN, Inc. v. Office of the Comm'r of Baseball, 76 F. Supp. 2d 416 (S.D.N.Y. 1999), Page 22

Carter v. Bruce Oakley, Inc., 849 F. Supp. 673 (E.D. Ark. 1993), Page 27

Reed v. Great Lakes Cos., 330 F.3d 931 (7th Cir. 2003), Page 28, 29

Van Koten v. Family Health Mgmt., 955 F. Supp. 898 (N.D. Ill. 1997), Page 29, 30, 31

Van Koten v. Family Health Mgmt., 1998 U.S. App. LEXIS 1837 (7th Cir. 1998), Page 30

Kreilkamp v. Roundy's, Inc., 428 F. Supp. 2d 903 (W.D. Wis. 2006), Page 30

## INTRODUCTION

Xodus wears dreadlocks for religious reasons. Wackenhut denied Xodus a job because he wouldn't cut off his dreadlocks. At Xodus' job interview (and during discovery, and in Wackenhut's Motion For Summary Judgment), Wackenhut took the position that dreadlocks violated its appearance and grooming policy. Wackenhut did not offer Xodus a religious accommodation, allowing him to work while wearing dreadlocks. Therefore, Wackenhut was required to demonstrate that accommodating Xodus would cause Wackenhut undue hardship.

In Xodus' Motion, Xodus cited case law showing that Wackenhut was required to *demonstrate* undue hardship by providing *concrete, non-speculative evidence* that it would *actually be harmed* by Xodus' dreadlocks; speculation regarding hypothetical harm does not establish a genuine issue of material fact regarding undue hardship.

Xodus showed that Wackenhut had failed to demonstrate undue hardship based on *concrete, non-speculative evidence*. Xodus also showed that Wackenhut was only speculating that dreadlocks (or a yarmulke or a turban) would harm Wackenhut.

Xodus showed that Wackenhut admitted that Wackenhut might be able to accommodate dreadlocks. Xodus also showed that Wackenhut had admitted that Wackenhut may already have allowed security officers to wear dreadlocks.

Xodus showed that Wackenhut did not take any steps to explore the possibility of an accommodation for Xodus. Xodus showed that Wackenhut did not ask any of its clients if they would accept an officer with dreadlocks (dreadlocks covered with a garrison hat or uncovered dreadlocks). And Xodus showed that Wackenhut had non-public-contact positions for officers, where an officer's appearance would not affect Wackenhut's public image.

Xodus showed that Wackenhut had been flexible with other parts of its appearance and grooming rules (regarding hats, beards, and crucifixes), without suffering any harm. That undermined Wackenhut's claims that an accommodation for dreadlocks would cause Wackenhut harm.

Xodus also showed that other security companies in the Chicago Area, which require a professional appearance, have been able to accommodate Xodus' dreadlocks after his interview with Wackenhut.

In its Response, Wackenhut has not challenged Xodus' legal arguments regarding Wackenhut's obligation to provide *concrete, non-speculative evidence* that it would be harmed by allowing Xodus to work while wearing his dreadlocks. Nor has Wackenhut properly denied (in Wackenhut's Response To Xodus' SOF) the above-mentioned facts showing lack of undue hardship.

Most importantly, in its Response to Xodus' Motion, Wackenhut has not provided any *concrete, non-speculative evidence* that it would have been harmed by allowing Xodus to work while wearing his dreadlocks. By failing to provide *concrete, non-speculative evidence*, Wackenhut has failed to meet its burden of establishing undue hardship.

Furthermore, as an Exhibit to Wackenhut's Response to Xodus' Motion, Wackenhut filed an affidavit admitting that it has accommodated an unidentified officer whose dreadlocks were short enough to be tucked under a garrison hat. (Wackenhut's Supplemental Appendix, Exhibit 1, Marmon Dec. ¶ 13-16.)[2] There is no evidence that Xodus' dreadlocks were too long to be tucked under a garrison hat at the time of his Wackenhut interview. The accommodation provided to the unidentified officer is further evidence that it would not have been an undue hardship for Wackenhut to allow Xodus to work while wearing his dreadlocks.

## ARGUMENT ON UNDUE HARDSHIP

**A.      Wackenhut Has Raised The Defense Of Undue Hardship**

---

[2] Wackenhut's Supplemental Appendix was filed with Wackenhut's Response To Xodus' Motion.

In its Response to Xodus' Motion, Wackenhut claims it has *never* raised the defense of undue hardship. Wackenhut raised the undue hardship defense at the EEOC (page 2 of Wackenhut's 9/22/06 letter to EEOC, Exhibit I, Xodus' Appendix 2)[3], and directly with Xodus prior to the Lawsuit (Wackenhut's 3/14/07 email to Xodus, Exhibit K, Xodus' Appendix 2). Furthermore, Wackenhut's 30(b)(6) witness speculated at her deposition that Wackenhut *might* be harmed by an officer wearing dreadlocks. (Marmon's speculation is addressed in detail in section G(3) of this Reply.) Then Wackenhut raised the undue hardship defense in its own Memorandum in Support of Wackenhut's Motion For Summary Judgment (second full paragraph of page 9 of Wackenhut's Memorandum). Finally, in footnote 1 of its Response to Xodus' Motion, Wackenhut reserved the right to raise the undue hardship defense at trial.

**B.  Xodus Has Not Admitted That Dreadlocks Would Cause Undue Hardship For Wackenhut**

In its Response to Xodus' Motion, Wackenhut claims that Xodus has admitted that allowing an officer to wear dreadlocks would harm Wackenhut. Wackenhut claims that, at his deposition, Xodus testified that "Wackenhut's clients could refuse to let Plaintiff work if he were not in compliance with the grooming policy (Wackenhut's SOF ¶ 9-10); That such a refusal would require Wackenhut to find a replacement for him, thereby incurring overtime and other costs (Wackenhut's SOF ¶ 11; and That such an exemption from the grooming policy could impact Wackenhut's ability to present a professional image, (Wackenhut's SOF ¶ 4, 5, 10-11)."[4] The record does not support Wackenhut's claims regarding Xodus' testimony; Xodus did not make these admissions. (Ironically, even if Xodus had made admissions that A *could* happen or that B *might* happen, such speculation would not be the type of *concrete, non-speculative evidence* that Wackenhut needs in order to survive summary judgment.)

On the transcript pages and line numbers cited by Wackenhut (in the above-mentioned SOF paragraphs), Xodus testified that at his orientation with a prior employer (Securitas), the trainer told the class that an officer's hair should not be a distraction, like colorful, spiked hair (Xodus Tr.

---

[3] "Xodus' Appendix 2" refers to Xodus' Appendix In Support Of Xodus' Response To Wackenhut's Motion For Summary Judgment. Xodus' Appendix 2 was filed in February 2009.

[4] "Wackenhut's SOF ¶ __" refers to Wackenhut's Statement Of Facts In Support Of Wackenhut's Motion For Summary Judgment.

137:21-138:6);[5] that such a hairstyle would not be professional (Xodus Tr. 139:14-21);[6] that Xodus understands that some employers want to have employees who are clean shaven, because they are working around food, or it could be a customer preference (Xodus Tr. 156:11-21); that Xodus understands that employers have requirements and grooming and dress codes so that there is a uniform appearance of their employees (Xodus Tr. 156:22-157:2); that it's okay for an employer to say employees need to have a professional appearance (Xodus Tr. 157:10-13); that Xodus has not heard the exact term "paramilitary hairstyle" or "paramilitary appearance" at various companies (Xodus Tr. 195:15-23); that before he interviewed at Wackenhut, Xodus was aware that there was a general standard for dress and grooming within the security industry as far as having a professional appearance (Xodus Tr. 212:21-213:6); that customers required security guards to have a professional appearance (Xodus Tr. 213:7-13); that when he walked into Wackenhut for his interview, Xodus knew that Wackenhut would want a professional appearance, but he didn't know Wackenhut's exact rules (Xodus Tr. 213:20-214:4); that he was aware that Wackenhut enters into a contract with a client, and that the client can set grooming standards in the contract (Xodus Tr. 310:11-21); that if a Wackenhut employee didn't comply with those grooming standards in the client contract, the client could ask to have that employee replaced (Xodus Tr. 311:2-9); and that Wackenhut would have to keep another officer at that post until a replacement for the employee could be found (Xodus Tr. 311:15-312:9).

Xodus' testimony regarding the importance of a professional appearance, and regarding the ability of Wackenhut's clients to enforce grooming standards that may be in their contracts with Wackenhut, is not *concrete, non-speculative evidence* that Wackenhut would be harmed if it allowed Xodus to wear dreadlocks on the job.

Regarding Xodus' "admission" about the ability of Wackenhut's clients to enforce grooming standards that may be in their contracts with Wackenhut, the fact is that most of Wackenhut's clients don't have grooming standards in their contracts. (Xodus' SOF ¶ 17, which should be deemed admitted because it was not admitted or denied by Wackenhut; Wackenhut's 1/30/09

---

[5] Xodus cites directly to his deposition transcript here, in order to show that Wackenhut has misrepresented Xodus' testimony on the pages referenced in Wackenhut's SOF ¶ 9, 10, and 11. Despite Wackenhut's claim that Xodus made "admissions" in Wackenhut's SOF ¶ 4 and 5, those paragraphs don't cite any testimony by Xodus.

[6] Citations in the format "Xodus Tr. __" refer to deposition transcripts. All deposition transcripts were provided in Xodus' Appendix 1. "Xodus' Appendix 1" refers to Xodus' Appendix In Support Of Xodus' Motion For Summary Judgment. Xodus' Appendix 1 was filed in December 2008.

Supplemental Responses To Xodus' Requests To Admit, Response to Request 12, Exhibit O, Xodus' Appendix 2.)[7]

None of Xodus' "admissions" dealt with any financial costs to Wackenhut (despite Wackenhut's claim that Xodus made admissions about "overtime and other costs"). In fact, Wackenhut would not incur any overtime expenses if a temporary replacement were needed; nor would Wackenhut incur hiring or training expenses if a permanent replacement were needed (because the open position would be offered to a floater or another existing Wackenhut officer). (Xodus' SOF ¶ 22-24, which were not admitted or denied by Wackenhut.)

The reality is that this situation imagined by Wackenhut would never arise, because a Wackenhut client would *never be surprised* by an officer showing up for work with dreadlocks.

In evaluating a request for a religious accommodation relating to Wackenhut's appearance and grooming standards, it was Wackenhut's policy to consider the views of the client. (Xodus' SOF ¶ 49, which was admitted by Wackenhut.) When officers have previously requested religious accommodations relating to Wackenhut's appearance and grooming standards (Xodus' SOF ¶ 44, which was not admitted or denied by Wackenhut), Wackenhut has checked with the client ahead of time to make sure the accommodation was acceptable. (Marmon Tr. 68:5-9; 70:2-71:2; 76:23-77:2.)

If Wackenhut had simply followed its policy of checking with its clients about whether they would accept Xodus' requested religious accommodation (working while wearing dreadlocks), there would have been no need for Wackenhut to speculate about whether a surprised client might suddenly prevent Xodus from working, requiring a last-minute replacement. And once Xodus was working for a willing client, Wackenhut's supervisors would have monitored Xodus' dreadlocks as they monitor all officers' grooming and appearance. (Marmon Tr. 131:2-3.)

But Krol and McCuller admitted that they never checked with any client about whether dreadlocks would be acceptable on a male officer. (Xodus' SOF ¶ 16, which was both denied and admitted by Wackenhut.)

---

[7]After Xodus filed his Motion To Determine The Sufficiency Of Defendant's Answers And Objections To Plaintiff's Requests To Admit, on 1/16/2009 this Court ordered Wackenhut to admit or deny this matter; although Wackenhut declined to use the words "admit" or "deny," Wackenhut's Response can fairly be interpreted as an admission. Alternatively, Request 12 should be deemed admitted based on Wackenhut's failure to comply with the Court's 1/16/2009 Order.

Wackenhut doesn't know how its clients would view an officer in dreadlocks. (Xodus' SOF ¶ 15.) Wackenhut is unaware of any clients saying they would not accept a male officer with long hair or dreadlocks. (Xodus' SOF ¶ 14.)

Further addressing the points made in Xodus' "admissions," there is no evidence that Xodus' dreadlocks would have looked unprofessional or distracting to clients. The issue of Xodus' appearance at the time of his Wackenhut interview is addressed in section E(3) of this Reply.

Furthermore, in the two known situations where Wackenhut has permitted officers to wear dreadlocks, Wackenhut has suffered no harm. Those instances are addressed in sections C and D of this Reply.

Wackenhut's claims about Xodus' "admissions" are just an attempt to distract attention from the fact that Wackenhut has no *concrete, non-speculative evidence* that it would be harmed by dreadlocks.

**C.    Years Before Xodus' Request For A Religious Accommodation, Wackenhut Accommodated Officer Aton's Dreadlocks Under A Garrison Hat**

By failing to properly respond to Xodus' Requests to Admit 1-9, Wackenhut should be deemed to have admitted that, prior to Xodus' request for a religious accommodation, Wackenhut accommodated Officer Aton's dreadlocks, without undue hardship, by permitting him to tuck his dreadlocks under a garrison hat.

Wackenhut should also be deemed to have admitted Xodus' SOF ¶ 42-43 relating to Officer Aton's accommodation, because Wackenhut improperly denied those Facts (based on Wackenhut's improper responses to Requests to Admit 1-9 and based on an improper affidavit).

Based on <u>Aton v. The Wackenhut Corp.</u>, 2002 WL 32502095 (D. Md. 2002), *affirmed*, 61 Fed.Appx. 96 (4th Cir. 2002) (unpublished) (Exhibit H, Xodus' Appendix 1), Xodus learned that Wackenhut had previously accommodated another Rastafarian officer's dreadlocks by permitting Officer Aton to tuck his dreadlocks under a garrison hat at a client site from May 1999 to August 2000. With this Court's permission, Xodus served Requests to Admit regarding Officer Aton's dreadlocks. On December 8, 2008, Wackenhut denied Requests 1-9, claiming that Defendant had never employed Officer Aton. After Xodus filed his Motion To Determine The Sufficiency Of Defendant's Answers And Objections To Plaintiff's Requests To Admit, on January 16, 2009 this Court issued an Order stating, "It is not obvious why the person discussed in the case relied upon by plaintiff is not a Wackenhut employee and if defendant does not, under oath, within 10 days explain why not, I will deem all the requests to admit that depend upon that alleged denial to be admitted."

Therefore, Wackenhut filed Marmon's January 30, 2009 affidavit (with Wackenhut's Response to Xodus' Motion), in which Marmon states, "The Wackenhut Corporation did not employ the plaintiff in that case, Rasun Heru Anpu Aton," and that Officer Aton actually worked for "Wackenhut Services, Inc." (Wackenhut's Supplemental Appendix, Exhibit 1, Marmon Dec. ¶ 5-6.)

Marmon's affidavit provided no foundation for Marmon's claim regarding Officer Aton. Wackenhut has more than 35,000 employees, and it has had thousands of employees around the country over the past 10 years; there is no indication in the affidavit about how Marmon reached her conclusion about whom Officer Aton did or did not work for, so this part of the affidavit should be stricken pursuant to FRCP 56(e)(1).

Furthermore, in ¶ 4 of its May 2001 Answer to Officer Aton's lawsuit, The Wackenhut Corporation stated, "Defendant admits that Plaintiff was formerly employed by Defendant." (The Wackenhut Corporation's Answer To Officer Aton's Lawsuit, Exhibit A, Xodus' Appendix 3.)[8] And of course, the District Court opinion and the Fourth Circuit opinion in the Aton case state that The Wackenhut Corporation prevailed in that case because The Wackenhut Corporation accommodated Officer Aton by having him tuck his dreadlocks under a garrison hat.

Wackenhut also argues that the District Court opinion and the Fourth Circuit opinion in the Aton case cannot be treated as evidence in this case; however, Courts may take judicial notice of the opinions of other Courts.

Finally, Wackenhut tries to distinguish the Aton case from Xodus' case. Wackenhut claims that a *garrison hat* (which Officer Aton ultimately used to cover his dreadlocks) was part of Officer Aton's official uniform. That claim is undercut by the Aton District Court opinion, which states that Officer Aton initially wore a *uniform cap* (which all male Wackenhut officers are required to wear, according to the Security Officer Handbook, Exhibit M to Xodus' Appendix 2; Xodus' SOF ¶ 64-65), and that Wackenhut *accommodated Officer Aton by having him switch to a garrison hat*. "The plaintiff, an African-American male who preferred to wear his hair long, and in dreadlocks, was counseled repeatedly on Wackenhut's Woodlawn grooming policy and, on May 27, 1999, was specifically informed that he must either cut his hair or keep it tucked under a *uniform hat*. Several days later, plaintiff came to work with his hair sticking out of his *uniform hat* by *a number of*

---

[8] "Xodus' Appendix 3" refers to Xodus' Appendix In Support Of Xodus' Reply to Wackenhut's Response to Xodus' Motion.

*inches*. Plaintiff refused to discuss the matter with his supervisor, and, on account of both his hair and his insubordination, he was suspended for four days. After his return to work, plaintiff wore a '*garrison hat*,' under which he could tuck his uncut dreadlocked hair, and he was not further disciplined on account of his grooming. … The fact is, plaintiff never was forced to cut his hair, but was *offered the reasonable accommodation of a garrison hat* even in the summer, *when other employees had to wear baseball hats*." Id. at *1-2 (emphasis added).[9]

Furthermore, in ¶ 15 of its Answer to Aton's Lawsuit, Wackenhut stated, "Defendant admits that officers at the Social Security Building wore baseball caps during the summer." Officer Aton was stationed at the Social Security Building. Aton at *1.

**D.    Wackenhut Has Admitted That Another, Unidentified Officer's Dreadlocks Did Not Cause Wackenhut Any Harm**

In the above-mentioned 1/30/09 affidavit, Marmon admitted that Wackenhut allowed another, unidentified officer to tuck his dreadlocks under a garrison hat, without Wackenhut losing a contract or suffering any other cost or harm. (Wackenhut's Supplemental Appendix, Exhibit 1, Marmon Dec. ¶ 13-20.) This was the same accommodation that Wackenhut gave Officer Aton 10 years earlier.

Wackenhut accommodated the unidentified officer even though he wore dreadlocks for personal (not religious) reasons. (¶ 14 of Marmon's affidavit.)

Wackenhut did not identify the officer, his location (other than saying he is in the mid-Atlantic region), the client(s) he worked for, how long his dreadlocks were, how big his oversize garrison hat was, or how many years he has worn dreadlocks on the job at Wackenhut.[10]

Although Wackenhut's unidentified client never objected to the officer's dreadlocks hairstyle, Wackenhut stated that, at some point, the unidentified client objected that the officer was wearing an *oversized* garrison hat, rather than a *standard size* garrison hat, to cover his dreadlocks. (¶ 16-17 of Marmon's affidavit.) As a result of the client complaint, Wackenhut gave the unidentified officer the option to (1) keep his dreadlocks as they were and leave that client's account[11] or to (2) shorten his dreadlocks, so they could fit under a regular size garrison hat, and

---

[9] Note that Officer Aton's dreadlocks could be tucked under a garrison hat even though his dreadlocks were so long that they stuck out of his uniform hat "by a number of inches." Aton at *1.

[10] If, for some reason, this Court denies Xodus' Motion For Summary Judgment, Xodus respectfully requests that this Court permit Xodus to conduct discovery relating to this newly disclosed, unidentified Wackenhut officer with dreadlocks.

remain with the account. (¶ 17-20 of Marmon's affidavit.) Because he did not wear his dreadlocks for religious reasons, the unidentified officer chose to shorten his dreadlocks so they could fit under a *standard size* garrison hat and remain with the unidentified client. (¶ 20 of Marmon's affidavit.) (There is no indication in Marmon's affidavit that the officer completely cut his dreadlocks off; if that were the case, Wackenhut would have mentioned that in Marmon's affidavit.)

The key point is that the unidentified officer's dreadlocks, and the unidentified client's complaint, did not result in any *harm* to Wackenhut.

Wackenhut previously speculated that if a client objected to an officer's appearance, the client could cancel the account, or there could be overtime and training expenses involved in replacing the officer. (Wackenhut's speculation is discussed in section G(3) of this Reply.) In the case of this unidentified officer and unidentified client, there was no such harm. (Had there been any harm or expense, Wackenhut would have mentioned that in Marmon's affidavit.)

Citing to Marmon's Affidavit on page 5 of its Response to Xodus' Motion,[12] Wackenhut appears to suggest that simply receiving a complaint from a client amounts to undue hardship. That is incorrect, and Wackenhut cites no authority to support this position. There is no evidence that the complaint by the unidentified client harmed Wackenhut in any way.

Furthermore, Wackenhut's 30(b)(6) representative admitted that clients complain about various issues "all the time." Getting complaints is just a normal part of doing business. Marmon testified, "I stated that I'm certain clients have complained about things. You know, they complain all the time about this and that. If they see security personnel, and I can't think of a specific

---

[11] Wackenhut's 30(b)(6) representative testified that if a client complained about an officer's grooming (e.g. a beard), Wackenhut would either try to persuade the client to allow the officer to remain with that account or Wackenhut would move the officer to a different account. (Xodus' SOF ¶ 59, which Wackenhut did not admit or deny.)

[12] In its Response to Xodus' Motion, Wackenhut cites directly to its Supplemental Appendix (containing Marmon's affidavit), because Wackenhut did not prepare a Statement Of Additional Material Facts as required by Local Rule 56.1. "Rule 12(n) is straightforward and clear; it requires each party opposing a motion for summary judgment to file (1) a response to each numbered paragraph in the moving party's statement, and (2) a statement of any additional facts that require denial of summary judgment. The rule therefore provides *the only acceptable means* of disputing the other party's facts and *of presenting additional facts to the district court*." <u>Midwest Imports v. Coval</u>, 71 F.3d 1311, 1317 (7th Cir. 1995) (affirming District Court's decision to disregard facts which were not included in the non-movant's Statement Of Additional Material Facts). Because Wackenhut has not filed a Statement Of Additional Material Facts, Xodus must respond to all of Wackenhut's new Facts in this Reply.

10

grooming issue, but if they see them looking sloppy, certainly we'll hear.  Our hope is the supervisors catch it before our client does."  (Marmon Tr. 130:21-131:3.)

In fact, the situation with this unidentified officer was resolved in exactly the way that previous appearance complaints had been resolved by Wackenhut.  When a client in the Chicago Loop had a concern about an officer's appearance, the client asked Wackenhut to fix the problem; the client didn't require Wackenhut to remove the officer from the account or seek to terminate the contract.  (Xodus' SOF ¶ 20.)

Furthermore, Wackenhut's 30(b)(6) representative testified that Wackenhut is unaware of any clients canceling accounts because of a grooming issue, and unaware of any of Wackenhut's client relations being damaged over an officer's appearance.  (Xodus' SOF ¶ 18.)  Wackenhut's top official in Wackenhut's "Chicago Area" was similarly unaware of any client canceling an account over a grooming issue.  (Xodus' SOF ¶ 6, 19, admitted by Wackenhut.)

Finally, it's worth noting that Wackenhut has not provided any information about the experiences of the other officers who Wackenhut admitted may be wearing dreadlocks at Wackenhut.  (Xodus' SOF ¶ 45, which Wackenhut didn't admit or deny.)  For all we know, those officers have been wearing their dreadlocks, of unknown lengths, with no problem at all.  After all, Wackenhut's corporate office learned that the unidentified officer was wearing dreadlocks only because the unidentified client complained about his oversize garrison hat.  Apparently, there have been no complaints about any of the other officers wearing dreadlocks.

**E.**   **With Wackenhut Having Taken Two Contradictory Positions Regarding The Acceptability Of Dreadlocks, This Court Should Decide Xodus' Motion Based On The Position That Is Most Favorable To Xodus**

Prior to January 30, 2009, Wackenhut took the position that no dreadlocks were permitted for male officers.  But now, having admitted that it has allowed at least one officer to work while wearing dreadlocks, Wackenhut takes the position that dreadlocks are *acceptable* for male officers if the dreadlocks can be tucked under a garrison hat.  Xodus should prevail on Wackenhut's defense of undue hardship regardless of Wackenhut's changing positions, but Xodus requests that this Court analyze Xodus' Motion in light of whichever Wackenhut position is most favorable to Xodus.

**1.**   **Until Wackenhut's Response To Xodus' Motion, Wackenhut Has Taken The Position That Dreadlocks Were Prohibited For Male Officers**

Wackenhut's SOF ¶ 5 (filed with this Court on December 12, 2008 to support Wackenhut's Motion For Summary Judgment) states, "The hairstyle known as 'dreadlocks' does not comply with

Wackenhut's Grooming Policy. (Marmon Dep. 25:4-11; McCuller Dep. (Vol. II) 62:2-6; KroI Dep. 121:21-122:7.)"  Xodus admitted Wackenhut's SOF ¶ 5.

To support Wackenhut's SOF ¶ 5, Wackenhut cited this testimony from Wackenhut's 30(b)(6) witness, Marmon: "Well, dreadlocks by themselves are not compliant with our grooming standard."  (Marmon Tr. 25:6-7.)

Furthermore, Wackenhut cited this testimony from the decision-maker, McCuller:  "Men had to be clean-shaven, hair neatly cut, groomed, no earrings at all for men."  (McCuller Dep. (Vol. II) 62:2-6.)[13]

Furthermore, McCuller testified that "Men can't have braids at all" at Wackenhut. (McCuller Tr. 168, line 13-20.)  McCuller testified that when he used the word "braids," that included dreadlocks.  (McCuller Tr. 169, lines 10-15.)  McCuller used the words "braids" and "dreadlocks" interchangeably to describe Xodus' hair.  (McCuller Tr. 204:21-205:9.)

McCuller testified that he told Xodus that Xodus had to remove his dreadlocks.  "All I asked Mr. Xodus would he mind taking the dreadlocks out."  (McCuller Tr. 264:10-11.)  "I asked him would he cut his hair, he said no, the conversation was done."  (McCuller Tr. 264:2-3.)[14]

Wackenhut's written policy states that male officers are required to have "short hair" that is "neatly combed."  (Xodus' SOF ¶ 10, which was admitted by Wackenhut.)  In Wackenhut's EEOC position statement, Marmon stated, "we do require that our security officers be clean-shaven with hair neatly trimmed."  (Wackenhut's 1/13/05 EEOC Position Statement, Exhibit G, Xodus' Appendix 2.)

### 2. Now Wackenhut Takes The Position That Some Dreadlocks Are Okay For Male Officers

On January 30, 2009, when Wackenhut filed its Response to Xodus' Motion, Wackenhut admitted that it has allowed at least one, unidentified officer (not Officer Aton) to work while wearing dreadlocks.  Stuck with that reality, Wackenhut now takes the position that dreadlocks are acceptable for male officers as long as the dreadlocks are short enough to be tucked under a garrison

---

[13] When McCuller's transcripts were numbered consecutively, this quotation appeared at McCuller Tr. 159:2-6.

[14] It is undisputed that, at Xodus' job interview, McCuller said that Xodus had to remove his dreadlocks. Xodus testified, "So he asked me would I be willing to *cut my dreadlocks off* and I explained to him the same as I told Securitas, I have my dreadlocks for religious reasons and would be unwilling to *cut them off*, so he said, well, unfortunately I won't be able to hire you for a position at the company."  (Xodus Tr. 219, line 2-8.) (Emphasis added.)

hat (or oversize garrison hat, in the case of the unidentified officer). Wackenhut has offered no explanation for this sudden change in its position on the acceptability of dreadlocks.

In her January 30, 2009 affidavit (which accompanies Wackenhut's Response to Xodus' Motion), Wackenhut's 30(b)(6) witness, Marmon, states that dreadlocks on a male officer *do* comply with Wackenhut's grooming policy. Marmon states regarding the unidentified officer (discussed above) wearing dreadlocks, "this individual was permitted to wear this hairstyle because he was arguably *in compliance with The Wackenhut Corporation's dress and grooming policy* and because this individual kept his dreadlocks short enough that the dreadlocks did not extend below his shirt collar, and the individual was able to tuck his dreadlocks under a garrison style hat…" (Wackenhut's Supplemental Appendix Exhibit 1, Marmon Dec. ¶ 15) (emphasis added).[15]

Based on this paragraph of Marmon's affidavit, it appears that there were two separate reasons that Wackenhut permitted the unidentified officer to wear dreadlocks. First, the dreadlocks hairstyle did not violate Wackenhut's policy. Second, the unidentified officer's dreadlocks were short enough to be tucked under a garrison hat. In ¶ 16 of her affidavit, Marmon explains that the unidentified officer was wearing "a hat that was noticeably larger than normal so that this individual could use the excess space to tuck his dreadlocks underneath the larger hat." There is no indication that Wackenhut had any objection to the use of the oversized garrison hat, as long as the dreadlocks were covered.

Based on Marmon's new position on dreadlocks, Wackenhut denied Xodus' SOF ¶ 11, which states, "Male officers were not permitted to have dreadlocks, regardless of length. (McCuller Tr. 168-169)" In denying this Fact, Wackenhut stated that *Xodus* was mischaracterizing the record.

Thus, Wackenhut has taken one position on the acceptability of dreadlocks in Wackenhut's SOF Supporting Wackenhut's Motion For Summary Judgment (no dreadlocks are acceptable on male officers), and the opposite position on the acceptability of dreadlocks in Wackenhut's Response To Xodus' SOF (dreadlocks are acceptable on male officers if they can be tucked under a garrison hat).

---

[15] If Wackenhut's change in position on the acceptability of dreadlocks proves harmful to Xodus, this Court should disregard the affidavit of Wackenhut's 30(b)(6) witness, Marmon, to the extent that the affidavit contradicts Marmon's testimony and changes Wackenhut's previous position. "Affidavits … when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy. [Citations omitted.] The explanation, moreover, must come in the affidavit itself, [citations omitted], not in a lawyer's musings, [citation omitted], which are not evidence." Beckel v. Wal-Mart Assocs., 301 F.3d 621, 623 (7th Cir. 2002) (disregarding Beckel's affidavit contradicting Beckel's deposition testimony). Marmon did not explain her change in position on the acceptability of dreadlocks.

Note that Wackenhut's SOF (filed with this Court on December 12, 2008) and Wackenhut's Response To Xodus' SOF (filed with this Court in January 2009) were <u>both</u> filed <u>after</u> Wackenhut's corporate office learned on December 3, 2008 (¶ 13 of Marmon's affidavit) that Wackenhut had accommodated the unidentified officer's dreadlocks, and <u>after</u> Wackenhut's corporate office learned on December 3, 2008 (¶ 15 of Marmon's affidavit) that dreadlocks could comply with its grooming policy.

### 3. Xodus Should Prevail On Summary Judgment Regardless Of Wackenhut's "Position Of The Day" Regarding Dreadlocks

Xodus has already shown that Wackenhut has not met its burden of providing any *concrete, non-speculative evidence* that a male officer wearing dreadlocks would cause Wackenhut harm.  In addition, Marmon's affidavit stating that the unidentified officer's dreadlocks were "in compliance with The Wackenhut Corporation's dress and grooming policy" (¶ 15 of Marmon's affidavit) further undermines Wackenhut's initial position that all dreadlocks would cause Wackenhut harm.

Furthermore, regarding Wackenhut's new position on the acceptability of short dreadlocks that can be tucked under a garrison hat, Wackenhut has not met its burden of showing that Xodus' dreadlocks could not fit under a garrison hat at the time of his interview with McCuller.  (Nor has Wackenhut provided *concrete, non-speculative evidence* that dreadlocks, which are too long to fit under a garrison hat, would cause Wackenhut undue hardship, because Wackenhut never checked with any of its clients to see whether they would accept an officer with dreadlocks. (Xodus' SOF ¶ 16, which was admitted and denied by Wackenhut.))

It is Wackenhut's burden to show that Xodus' dreadlocks would have created an undue hardship on Wackenhut.  Therefore, it is Wackenhut's burden to show that Xodus' dreadlocks were not short enough to fit under a garrison hat at the time of his Wackenhut job interview.  There is no evidence of that.  (Part of the reason for this lack of evidence is that McCuller was focused on the fact that Xodus had dreadlocks, not on the length of Xodus' dreadlocks.)

In Wackenhut's Response to Xodus' SOF ¶ 57 (which is an inappropriate place for Wackenhut to be making arguments, especially since Xodus' SOF ¶ 57 makes no reference to Xodus' hairstyle), Wackenhut argues that "Plaintiff's hairstyle was not neat in appearance nor appeared professional. (Krol Dep. 124:16 – 20; McCuller Dep. (Vol. II) 204:21 – 205:9.)" Wackenhut cites to a portion of the record where McCuller testified that he doesn't recall how long Xodus' dreadlocks were, or how they looked, at the time of Xodus' interview.  Wackenhut also cites to a statement by Krol, who stated that Xodus' dreadlocks, as they appeared at the time of

14

Krol's deposition in *October 2008*, were not in compliance with Krol's understanding of Wackenhut's grooming policy. That deposition, which took place more than four years after Xodus' interview with Wackenhut, was the first time Krol ever saw Xodus. Wackenhut has offered no evidence that Xodus' dreadlocks were "not neat" or unprofessional at the time of his interview; nor has Wackenhut offered any evidence that Xodus' dreadlocks could not have fit under a garrison hat.

In fact, Xodus' dreadlocks were "neat" and short enough to fit under a garrison hat at the time of his Wackenhut interview on July 7, 2004.

The record contains evidence regarding the appearance of Xodus' dreadlocks at three points in time.

**Xodus' Dreadlocks A Few Months Before Xodus' Wackenhut Interview**

Wackenhut's attorney questioned Xodus about an ID picture of Xodus, taken on March 23, 2004, a few months before his July 7, 2004 Wackenhut interview. (Xodus Tr. 132:11-22; Xodus' March 23, 2004 Securitas ID Picture, Exhibit B, Xodus' Appendix 3.) On March 23, 2004, his hair was close to the sides of his head; it was not sticking out in any way; the back of his hair was in a ponytail reaching below the neck collar; the sides of his hair came to the middle of the ear, maybe to the earlobe. (Xodus Tr. 132:23-133:20.) Wackenhut's attorney described Xodus' hair in the picture as follows: "And in that picture, it appears that your hair is close to the sides of your head, correct?" (Xodus Tr. 132:23-133:1.) Wackenhut's attorney also said, "And it's not sticking out in any way, it appears, well, neat for lack…" (Xodus Tr. 133:3-4.) As is clear from the ID picture, these were not dreadlocks that were out of control.

**Xodus' Dreadlocks During Xodus' Wackenhut Interview**

Xodus testified without contradiction that, at the time of his Wackenhut interview (a few months after the Securitas ID picture was taken), "The sides probably came below the earlobe maybe a little bit, at least below the earlobe -- yeah, below the earlobe and the back was below the neck." (Xodus Tr. 211:4-9.) McCuller testified that he doesn't recall how long Xodus' dreadlocks were, or how they looked, at the time of Xodus' interview. (McCuller Tr. 204:21-205:9.)[16]

Xodus was prepared to pull his dreadlocks up above his shirt collar and cover up his dreadlocks if Wackenhut requested. (Xodus' SOF ¶ 51, which Wackenhut did not admit or deny.)

---

[16] Note that Officer Aton's dreadlocks could be tucked under a garrison hat even though his dreadlocks were so long that they stuck out of his uniform hat "by a number of inches." Aton at *1.

But Wackenhut never considered that option for Xodus. (Xodus' SOF ¶ 50, which was not admitted or denied by Wackenhut.)

It is Wackenhut's burden (on undue hardship) to show that Xodus' dreadlocks could not have been tucked under a regular size garrison hat, or an oversize garrison hat (like the one worn by the unidentified officer), but there is no evidence of that. (Of course, the best evidence for Wackenhut would have been for Wackenhut to have Xodus try a garrison hat on at the time of the interview. But that didn't cross McCuller's mind, because Wackenhut's position at the time of Xodus' interview was that male officers could not wear dreadlocks at all.)

Wackenhut has argued that a garrison hat was not an available accommodation for Xodus, because most of Wackenhut's officers in Chicago did not wear hats. Wackenhut's national appearance policy required all male officers around the country to wear hats. (Xodus' SOF ¶ 40, 53, 64, 65.) The fact that Wackenhut's Chicago Area office chose not to enforce Wackenhut's national appearance policy regarding hats does not save Wackenhut from its religious accommodation obligations (i.e. exploring the possibility of accommodating an officer by having him wear a hat). Furthermore, Wackenhut never checked with its clients to see if they would agree to allow Xodus to work while wearing a garrison hat.

Of course, this analysis doesn't even take into consideration the fact that there may have been Wackenhut clients who would have been willing to let Xodus work with his dreadlocks uncovered, just as clients of other security companies have allowed Xodus to do since his interview with Wackenhut.

Xodus' dreadlocks were sufficiently professional for him to wear them while working as a security officer for several security companies (which require a professional appearance[17]), after the discrimination by Wackenhut. No clients of any of those security companies complained about his dreadlocks. While Mr. Xodus worked as a security officer, his dreadlocks never interfered with his ability to command the respect of the public. While he worked as a security officer, members of the public listened to him. While he worked as a security officer, members of the public were not distracted by his dreadlocks. Mr. Xodus' dreadlocks have not interfered with his ability to do his job as a security officer in any way. (Xodus' SOF ¶ 52, which was not admitted or denied by Wackenhut.)

---

[17] Wackenhut's SOF ¶ 9 states, "in general, the security industry insists on a professional appearance…" Xodus admitted this part of Wackenhut's SOF ¶ 9.

**Xodus' Dreadlocks Four Years After Xodus' Wackenhut Interview**

As of Xodus' deposition in June 2008, *four years after his Wackenhut job interview*, the dreadlocks at the back of his head had reached the middle of his back, around his shoulder blades, and the dreadlocks on the sides of his head had reached a little past his shoulders. (Xodus Tr. 157:23-159:1.)

**F.     Xodus' Statement Of Facts Should Be Deemed Admitted Because of Wackenhut's Improper Responses**

Wackenhut has improperly responded to Xodus' SOF. So Xodus' Facts should be deemed admitted.[18]

Local Rule 56.1(b)(3)(B) requires "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon..."

"Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion." Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003).

"Rule 12(N) is not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted. It is also not satisfied by citations to the record that support legal argument rather than controvert material facts. In other words, for a 12(N) statement to be useful, denials must be made only if the material fact asserted is actually in dispute. And if a material fact is not disputed (or if there is no evidence that controverts the fact), the district court is entitled to know that up front, without first having to examine citations to evidence having only marginal bearing on the question. … We think, however, that the purpose of Local Rules 12(M) and (N)--to require the parties to identify the disputed issues in a concise format--would be defeated if the court were required to wade through improper denials and legal argument in search of a genuinely disputed fact." Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524, 528-529 (7th Cir. 2000) (striking Bordelon's entire Response to SOF).

**1.     Facts Admitted By Wackenhut**

Wackenhut has admitted 16 of Xodus' 70 Facts: ¶¶ 2, 3, 4, 5, 6, 7, 10, 19, 40, 41, 49, 53, 54, 66, 67, 68. These facts relate to jurisdiction, and background information about witnesses whose testimony was cited by Xodus (¶¶ 2, 3, 4, 5, 6, 7); issues relating to Wackenhut's appearance and

---

[18] Wackenhut has similarly improperly responded to many Facts in Xodus' Statement of Additional Facts.

grooming policy (¶¶ 10, 19, 40, 53, 54, 68); Wackenhut's EEO policy (¶ 41); Wackenhut's handling of religious accommodation requests (¶ 49); and Wackenhut's flexibility regarding its policy requiring male officers to wear uniform hats (¶¶ 66, 67).

### 2. Facts Explicitly Denied By Wackenhut

Wackenhut has explicitly denied 18 of Xodus' 70 facts.

Wackenhut denied the following Facts without any evidentiary support: ¶¶ 1 (denying that Xodus wears dreadlocks for religious reasons), 64 (denying that the appearance policy in Wackenhut's Security Officer Handbook states that caps are required for male officers).

Wackenhut denied the following Facts by arguing that Xodus has misrepresented testimony: ¶¶ 8, 9, 11, 12, 14, 15, 16 (denying and simultaneously admitting a Fact), 18, 20, 21, 26, 27, 28, 65. These facts relate to Wackenhut's admissions that it doesn't know if Wackenhut would be harmed by an officer wearing dreadlocks (¶¶ 8, 9, 14, 15, 16, 18, 26); Wackenhut's handling of various issues relating to the appearance and grooming policy (¶¶ 11, 12, 20, 21, 65); and the availability of non-public-contact positions in Chicago (¶¶ 27, 28). To deny these Facts, Wackenhut usually states that Xodus has misrepresented testimony; then, without addressing Xodus' fact head-on, Wackenhut cites to a portion of the record that deals with a separate point, or Wackenhut misrepresents testimony.

Wackenhut denied the following Facts based on Wackenhut's claim that Officer Aton did not work for Wackenhut: ¶¶ 42, 43. These facts relate to Wackenhut's accommodation of Officer Aton's dreadlocks under a garrison hat. This issue was addressed in detail in section C of this Reply.

Because Wackenhut has not properly denied any of these facts, they should all be deemed admitted.

### 3. Facts Not Explicitly Admitted Or Denied By Wackenhut

Wackenhut has failed to explicitly admit or deny 36 Facts: ¶¶ 13, 17, 22, 23, 24, 25, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 44, 45, 46 (admitted a different matter than the Fact), 47, 48, 50, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 63, 69, 70.

These facts relate to Wackenhut's handling of issues relating to the appearance and grooming policy (¶¶ 13, 39); the absence of grooming rules in most of Wackenhut's client contracts (¶ 17); Wackenhut's handling of situations where an officer can't work his shift and needs to be replaced (¶¶ 22-25); the availability of non-public-contact positions in Chicago (¶¶ 29-38); Wackenhut's handling of religious accommodation requests (¶¶ 44-47); issues relating to the

accommodation of dreadlocks (¶¶ 48, 50-52); Wackenhut's flexibility regarding its no-beard policy, and the lack of harm caused by that flexibility (¶¶ 55-63); and Wackenhut's flexibility regarding its policy prohibiting the wearing of religious symbols like a crucifix (¶¶ 69, 70).

Wackenhut usually declares these Facts "immaterial" and states that Xodus has misrepresented testimony; then, without addressing Xodus' fact head-on, Wackenhut cites to a portion of the record that deals with a separate point, or Wackenhut misrepresents testimony.

Wackenhut also makes legal arguments in its Response to Xodus' SOF relating to some of these facts, and cites to case law (which is not on point, by the way), to challenge the relevance of some facts.[19]

Because Wackenhut has not properly responded to these facts, they should be deemed admitted.

## G. Xodus' Statement Of Facts Properly Supports Xodus' Motion

In its Response to Xodus' Motion, Wackenhut asks the Court to disregard 54 out of 70 Facts in Xodus' SOF as "out of context," "not of evidentiary quality," and "not relevant." Wackenhut is wrong.

Ironically, even if all of these facts are stricken, Xodus should still prevail on summary judgment, because Wackenhut has not met its burden of offering *concrete, non-speculative evidence* that it would be harmed by dreadlocks.

Wackenhut has highlighted the following categories of Facts, so Xodus responds in detail.

### 1. Facts Establishing The Existence Of Non-Public-Contact Positions Are Relevant And Should Be Deemed Admitted

Wackenhut asks the Court to disregard all facts that establish that Wackenhut had positions that did not involve contact with the public. (See Xodus' SOF ¶ 27-38; Wackenhut did not admit or deny ¶ 29-38). Why does Wackenhut think these facts are "immaterial" for the undue hardship

---

[19] For example, in its Response to Xodus' SOF, Wackenhut states that some of Xodus' Facts (¶ 57, 58, 59, 60, 61, and 63, which show that Wackenhut has suffered no harm despite its flexibility with another part of its grooming policy, the no-beard policy) are "immaterial." Wackenhut states that it is irrelevant that Wackenhut is flexible with its no-beard rule for medical reasons, arguing that such accommodations are required by the Americans with Disabilities Act which involves a different accommodation analysis than Title VII requires for religious accommodation cases. Wackenhut cites a U.S. Supreme Court opinion to argue that the ADA involves a different accommodation analysis than Title VII. Of course, Wackenhut's point regarding the ADA is not relevant here, because cases involving exceptions to no-beard rules for African-Americans are *race discrimination* cases not ADA cases, as explained in Adams v. City of Chicago, 469 F.3d 609, 617 (7th Cir. 2006). Wackenhut also says it's "immaterial" that Wackenhut may have permitted officers to wear beards for non-medical reasons. (Xodus' SOF ¶ 56, which Wackenhut did not admit or deny.)

analysis? Because (according to Wackenhut's circular logic) a non-public-contact position would not be available to Xodus since he was not in compliance with Wackenhut's grooming rules.

Wackenhut ignores the point that giving an employee a non-public-contact position can be a reasonable accommodation, which eliminates the employer's concern about the public seeing an officer in dreadlocks. Wackenhut's 30(b)(6) representative speculated about this concern at her deposition. When asked if Wackenhut had any concerns about dreadlocks (and other accommodations to the appearance and grooming rules), Marmon replied, "I don't know but potentially if that officer had regular *interactions with the public* or other potential clients." (Marmon Tr. 102, line 10-12.) "The reason could be -- and again, I'm just sort of talking -- could be, *depending on where that officer is posted*, you know, and *if they're visible to the public*, that's the face of Wackenhut, that's what other potential clients see, it could hurt our business in terms of selling business. But I don't know." (Marmon Tr. 102:20-103:2.)

In <u>EEOC v. UPS</u>, 94 F.3d 314 (7th Cir. 1996), the Seventh Circuit suggested that if a defendant offered an employee (who wore a beard for religious reasons) a non-public contact position in exchange for a public contact position, that would be a reasonable accommodation. In that case, the Seventh Circuit determined that UPS had failed to offer the employee a non-public-contact position. "The district court found that UPS had reasonably accommodated Patel by offering him a full-time inside job as a package sorter and that Patel had refused to accept the accommodation. Patel, on the other hand, contends that he was told that he faced a long wait before an inside position would be available to someone of his seniority… If Patel was told there would be a long wait for a nonpublic-contact job, he was not offered a reasonable accommodation, whether or not such a waiting list actually existed." <u>Id</u>. at 319-320.

Wackenhut has not properly admitted or denied these facts, so they should be deemed admitted.

> **2. Facts Establishing The Lack Of Financial Costs That Would Be Incurred By Wackenhut, As A Result Of An Accommodation, Are Relevant And Should Be Deemed Admitted**

Wackenhut asks the Court to disregard all facts that establish that Wackenhut would not suffer financial costs if a client wanted to replace an officer due to his appearance. (See Xodus' SOF ¶ 22-24, which Wackenhut did not admit or deny.) These facts establish that if a client were to prevent an officer from working due to his appearance, a trained Wackenhut floater would fill in for the replaced officer at no additional cost to Wackenhut or the client; that if an officer from the previous shift had to fill in for the replaced officer, Wackenhut would adjust the stay-over officer's

20

hours to prevent the incurring of overtime; and that if Wackenhut had to permanently fill the replaced officer's position, Wackenhut would not have to hire or train anyone new, because the position would go to a floater or another existing officer. Ironically, after claiming that this cost issue is not relevant, Wackenhut concedes, "At best, they [Xodus' SOF ¶ 22-24] relate to what Wackenhut would have to do if it tried to accommodate Plaintiff…," which Wackenhut did not try to do.

Wackenhut has declined to admit or deny these facts, so they should be deemed admitted.

### 3. Facts, Establishing That Wackenhut's Claim Of Undue Hardship Is Speculative, Are Relevant And Should Be Deemed Admitted

Wackenhut argues that the Court should disregard facts establishing Wackenhut's lack of knowledge regarding how Wackenhut would be harmed, or has been harmed, by allowing an officer to wear dreadlocks. (See Xodus' SOF ¶ 8, 9, 14, 15, 18, 26.) These facts are based on testimony by Wackenhut's 30(b)(6) witness. The case law cited in Xodus' Motion, and unchallenged in Wackenhut's Response, establishes that an employer cannot rely on speculation to establish undue hardship.

Xodus' 30(b)(6) deposition notice required Wackenhut to produce a witness prepared to testify about "How Defendant would be harmed, or has been harmed, by accommodations relating to the appearance and grooming rules." (Category 6 on Xodus' 30(b)(6) Deposition Notice, attached at the end of the Deposition Transcript of Patricia Marmon, Exhibit C, Xodus' Appendix 1).

Marmon is Wackenhut's Vice President Of Equality Programs. (Xodus' SOF ¶ 7, admitted by Wackenhut.) Wackenhut designated Marmon as its 30(b)(6) witness. (Marmon Tr. 3:17-4:1; Xodus' SOF ¶ 7, admitted by Wackenhut.) At the beginning of the deposition, Marmon testified that Wackenhut had asked her, and that she had consented, to testify on behalf of Wackenhut regarding categories 1, 2, 3, 4, 5, and 6 on the 30(b)(6) notice. (Marmon Tr. 7, line 13-18; page 8, line 16-18; Xodus' 30(b)(6) Deposition Notice.) Marmon testified that she had prepared for purposes of testifying regarding Wackenhut's position on categories 1, 2, 3, 4, 5, and 6 on the 30(b)(6) notice. (Marmon Tr. 9, line 1-4.)

However, Wackenhut's attorney and Marmon both said Marmon was not prepared to testify about category 7 on the 30(b)(6) notice, regarding McCuller's employment history. (Marmon Tr. 5, line 1-9; Xodus' 30(b)(6) Deposition Notice.) Therefore, Xodus did not question Marmon about category 7.

Marmon proceeded to testify about Wackenhut's position on categories 1, 2, 3, 4, 5, and 6.

When Marmon answered questions about how Wackenhut would be harmed by dreadlocks, she acknowledged that she *did not know* how Wackenhut would be harmed, and that she was *speculating* about possible harm. (This is explained in detail below.) Wackenhut claims that Xodus asked Marmon to speculate, but that's false. Xodus simply asked legitimate questions about undue hardship.

In the course of speculating about possible harm to Wackenhut, Marmon did not claim that she was unprepared to answer these questions. She did not state that someone else was better able to answer these questions on behalf of Wackenhut. Wackenhut did not seek to designate anyone else to testify about how Wackenhut would be harmed, or had been harmed, by dreadlocks.

The fact that the 30(b)(6) witness said she was speculating about issues listed in the 30(b)(6) notice did not make Xodus' questions improper.[20] Otherwise any 30(b)(6) witness could defeat the purpose of a deposition by saying that she was "speculating."

Essentially, Wackenhut is arguing that if Wackenhut lacks knowledge about an issue in the 30(b)(6) notice, Xodus may not use that lack of corporate knowledge against Wackenhut.[21]

It is not surprising that Wackenhut does not know how dreadlocks would harm Wackenhut, because dreadlocks (and other accommodations to Wackenhut's grooming and appearance rules) have *never* harmed Wackenhut. Wackenhut's undue hardship defense is *speculative*.[22]

In footnotes 3 and 4 of Wackenhut's Response to Xodus' Motion, and in Wackenhut's Response to Xodus' SOF, Wackenhut objected to the basis for Xodus' SOF ¶ 8, 9, 14, 15, 18, 26, so Xodus explains the basis for those Facts here by providing quotations from Marmon's transcript. (Of course, these paragraphs don't exist in a vacuum; the record taken as a whole clearly shows there is no *concrete, non-speculative evidence* that Wackenhut would be harmed by dreadlocks.)

**Xodus' SOF ¶ 8**

---

[20] Courts have relied on the speculative testimony of a 30(b)(6) witness to find that the corporation was speculating about an issue. See, for example, ESPN, Inc. v. Office of the Comm'r of Baseball, 76 F. Supp. 2d 416, 419 (S.D.N.Y. 1999), where the Court relied on the speculative testimony of the Office of the Commissioner of Baseball's 30(b)(6) witness to conclude that the Office of the Commissioner of Baseball was only speculating about the harm it had suffered in a breach of contract case. "Baseball's 30(b)(6) witness on the topic of damages, Baseball's President Paul Beeston, was equally speculative and vague regarding the alleged harm caused by ESPN's breach."

[21] Ironically, defendants usually argue that a plaintiff can't rely on the plaintiff's own speculation; but here, Defendant argues that Plaintiff can't rely on Defendant's speculation.

[22] As shown by the cases cited in Xodus' Motion, Wackenhut is not the first company to speculate that it *might* be harmed by a religious accommodation.

Xodus' SOF ¶ 8 states, "Wackenhut doesn't know if religious accommodations for dreadlocks would harm Wackenhut. (Marmon Tr. 100-103)."

Wackenhut objects to Xodus' SOF ¶ 8 on the grounds that Xodus asked Marmon to speculate.

On pages 100-101 of Marmon's deposition, Xodus asked how Wackenhut would be harmed by various possible religious accommodations to the appearance and grooming rules. Marmon responded, "Again, *I don't know*. *If* our clients objected and felt that this did not fit our image and we lost the account, certainly it would harm us." (Marmon Tr. 101, line 9-11.) Having established that Wackenhut didn't know *whether* a client would object and cancel an account due to a religious accommodation, Xodus asked on page 102, "If the client had no objection to an officer wearing dreadlocks, would Wackenhut be harmed in any way?" Marmon responded, "*I don't know* but *potentially if* that officer had regular interactions with the public or other potential clients. … The reason *could be -- and again, I'm just sort of talking -- could be*, depending on where that officer is posted, you know, and *if* they're visible to the public, that's the face of Wackenhut, that's what other potential clients see, it *could hurt* our business in terms of selling business. *But I don't know*." (Marmon Tr. 102:10-12, 20-24; page 103:1-2.) Marmon said the same concerns applied to dreadlocks, a turban, and a yarmulke. (Marmon Tr. 103, line 2-6.) Saying that religious accommodations for dreadlocks would harm Wackenhut *if* X happened or *if* Y happened means that Wackenhut *doesn't know* that it will be harmed by dreadlocks. Wackenhut is simply speculating, and that does not establish undue hardship.

### Xodus' SOF ¶ 9

Xodus' SOF ¶ 9 states, "Wackenhut doesn't know if Wackenhut would be harmed by having a male security officer with long hair. (Marmon Tr. 35)"

Wackenhut objects to Xodus' SOF ¶ 9 on the grounds that Marmon was speculating in response to improper, hypothetical questions asked by Xodus.

Xodus asked Marmon, "Would Wackenhut be harmed if it hired a male officer who had long hair?" (Marmon Tr. 35:9-10.) This was a legitimate question about undue hardship. Marmon responded, "*You're asking me to speculate*…" (Marmon Tr. 35:11.) She then testified that a client "*could* cancel the contract, they *could* ask for that person to be removed from the contract, therefore, requiring us to go to some expense of hiring someone else, training someone else. Either of those things would be a distinct *possibility*." (Marmon Tr. 35:17-22.) This establishes that Wackenhut *doesn't know* if Wackenhut would be harmed by having a male security officer with long hair.

23

Furthermore, Xodus asked, "Have you told me all the reasons that you believe that Wackenhut would be harmed if a male officer had long hair?" (Marmon Tr. 38:19-21.) Marmon responded, "All of the reasons? A client *could* most definitely cancel a contract which would be -- would harm us. We -- you know, *if* we had to replace the security officer, that would be an expense. We've trained one security officer and we have to train another one, *may* incur overtime, those are primarily what I'm aware of." (Marmon Tr. 38:19-39:4.) Xodus asked, "And I'm going to ask you the same question with regards to how Wackenhut would be harmed if a male officer had dreadlocks, would the answer be the same?" Marmon responded, "Yes." (Marmon Tr. 39:5-9.)

### Xodus' SOF ¶ 14

Xodus' SOF ¶ 14 states, "Wackenhut is unaware of any clients saying they would not accept a male officer with long hair or dreadlocks. (Marmon Tr. 36)"

Wackenhut objects to Xodus' SOF ¶ 14 on the grounds that Marmon was speculating in response to improper, hypothetical questions asked by Xodus.

Xodus asked Marmon, "Have any clients ever told Wackenhut that they don't want an officer with long hair, a male officer with long hair?" (Marmon Tr. 36:5-7.) This was a legitimate question about undue hardship. Marmon responded by saying, "I can't answer that, *I don't know*." (Marmon Tr. 36:8.) Xodus then asked Marmon, "Has any client ever told Wackenhut that it would not accept a male officer wearing dreadlocks?" (Marmon Tr. 36:9-10.) This was a legitimate question about undue hardship. Marmon responded by saying, "Again, I can't answer that. I have -- *I don't know, I would be speculating*." (Marmon Tr. 36:11-12.) This establishes that Wackenhut is *unaware* of any clients saying they would not accept a male officer with long hair or dreadlocks.

Just a few lines down, Marmon confirmed that she was answering in her 30(b)(6) capacity. Xodus asked, "But you understand that I'm asking you these questions not related to your position but in your capacity as the corporate representative of Wackenhut, you understand that?" (Marmon Tr. 36:21-24.) Marmon answered, "Yes. I just -- I simply don't know the answer." (Marmon Tr. 37:1-2.)

### Xodus' SOF ¶ 15

Xodus' SOF ¶ 15 states, "Wackenhut doesn't know how its clients would view an officer in dreadlocks. (Marmon Tr. 123)"

Wackenhut objects to Xodus' SOF ¶ 15 on the grounds that Marmon was speculating in response to improper, hypothetical questions asked by Xodus.

Marmon testified that some clients have grooming policies in their Wackenhut contracts. (Marmon Tr. 123:4-9.)  (Since then, Wackenhut has admitted that most of its client contracts do not contain grooming policies.  See Wackenhut's 1/30/09 Supplemental Responses To Xodus' Requests To Admit, Response to Request 12, Exhibit O, Xodus' Appendix 2.)[23]  Xodus asked, "Other than the contract in your corporate capacity, do you know how your clients would feel about an officer wearing dreadlocks?"  (Marmon Tr. 123:11-13.)  This was a legitimate question about undue hardship.  Marmon responded, "*I don't know* how our clients would definitely feel about that but I can make a reasonable *assumption* that they would have some concerns.  *It hasn't happened.*"  (Marmon Tr. 123:14-17.)  This establishes that Wackenhut *doesn't know* how its clients would view an officer in dreadlocks.

**Xodus' SOF ¶ 18**

Xodus' SOF ¶ 18 states, "Wackenhut is unaware of any clients asking that an officer be removed from an account due to a grooming issue, unaware of any clients canceling accounts because of a violation of Wackenhut's grooming policy by an officer, and unaware of any of Wackenhut's client relations being damaged over an officer's appearance.  (Marmon Tr. 36, 130-132)"

Wackenhut objects to Xodus' SOF ¶ 18 on the grounds that Marmon was speculating in response to improper, hypothetical questions asked by Xodus.

Xodus asked Marmon, "Did you testify that -- this was in your corporate capacity -- clients have complained about appearance and grooming issues related to various officers?"  (Marmon Tr. 130:17-20.)  Marmon replied, "I stated that I'm certain clients have complained about things.  You know, they complain all the time about this and that.  If they see security personnel, and I can't think of a specific grooming issue, but if they see them looking sloppy, certainly we'll hear. … Again, I can't recall a specific instance so I can't recall a specific result from that.  If a client complains about a security officer's appearance, I can only know what we would do about that which would be to talk to the officer, tell -- you know, some form of counseling and hope that that would be resolved.  There *could be times where the client just says enough, I want them out of there*.  Some clients don't give security personnel a second chance."  (Marmon Tr. 130:21-131:2, 131:7-16.)  Xodus asked,

---

[23]After Xodus filed his Motion To Determine The Sufficiency Of Defendant's Answers And Objections To Plaintiff's Requests To Admit, on 1/16/2009 this Court ordered Wackenhut to admit or deny this matter; although Wackenhut declined to use the words "admit" or "deny," Wackenhut's Response can fairly be interpreted as an admission.  Alternatively, Request 12 should be deemed admitted based on Wackenhut's failure to comply with the Court's 1/16/2009 Order.

"Okay.  In your corporate capacity, has that happened?"  (Marmon Tr. 131:17-18.)  This was a legitimate question about undue hardship.  Marmon responded, "On a specific grooming issue, *I can't recall.*"  (Marmon Tr. 131:19-20.)  This establishes that Wackenhut is *unaware* of any clients asking that an officer be removed from an account due to a grooming issue.

Xodus asked Marmon, "And so has any client ever cancelled an account because of a violation of Wackenhut's grooming policy by an officer?"  (Marmon Tr. 36:13-15.)  This was a legitimate question about undue hardship.  Marmon responded by saying, "I can't answer that either. I don't in the course of my position work directly with clients. … So *I just don't know.*"  (Marmon Tr. 36:16-20.)  This establishes that Wackenhut is *unaware* of any clients canceling accounts because of a violation of Wackenhut's grooming policy by an officer.  (Xodus' next question was, "But you understand that I'm asking you these questions not related to your position but in your capacity as the corporate representative of Wackenhut, you understand that?"  (Marmon Tr. 36:21-24.)  Marmon answered, "Yes.  I just -- I simply don't know the answer."  (Marmon Tr. 37:1-2.))

Xodus asked Marmon, "In your corporate capacity, have any clients -- are you aware of any client relationships being damaged because a client was concerned about the way an officer appeared, the way an officer looked?"  (Marmon Tr. 132:3-7.)  This was a legitimate question about undue hardship.  Marmon responded, "*I'm not aware* of a specific instance like that."  (Marmon Tr. 132:10-11.)  This establishes that Wackenhut is *unaware* of any of Wackenhut's client relations being damaged over an officer's appearance.

### Xodus' SOF ¶ 26

Xodus' SOF ¶ 26 states, "Wackenhut doesn't know how the public would view an officer in dreadlocks.  The public is diverse.  Furthermore, Wackenhut believes it's beside the point how the public would feel about an officer in dreadlocks, because Wackenhut projects the image Wackenhut wants to project.  (Marmon Tr. 119-122)"

Wackenhut objects to Xodus' SOF ¶ 26 on the grounds that Marmon was speculating in response to improper, hypothetical questions asked by Xodus.

Xodus asked, "So when I say -- when I ask about the views of the public relating to Yamaka, turban, dreadlocks, you're saying you don't know?"  (Marmon Tr. 119:21-23).  Marmon answered, "We market and sell this paramilitary image with this particular uniform, that's what we sell.  *That's who we are.*  So, you know, you're asking me if, you know, people make alterations to the uniform in some way if the public -- how they're going to feel about that, *I don't know.  And I guess I just think it's honestly beside the point.* … The main point is we're a security company with

26

a uniform policy that has a proud relationship with the military that has had *since Mr. Wackenhut started the company years and years ago* and that we sell this image …"[24] (Marmon Tr. 120:11-24.)  This establishes that Wackenhut believes it's *beside the point* how the public would feel about an officer in dreadlocks, because *Wackenhut projects the image Wackenhut wants to project.*

Xodus asked Marmon, "In your corporate capacity you don't know how the public would react to an officer wearing dreadlocks, right?"  (Marmon Tr. 122:11-13.)  This was a legitimate question about undue hardship.  Marmon responded, "No, *I don't know* how the public would act. The public's made of lots of different people too.  *I'm sure some of the public might think one way, some another.*"  (Marmon Tr. 122:14-17.)  This establishes that Wackenhut *doesn't know* how the diverse public would view an officer in dreadlocks.

WHEREFORE, Xodus respectfully requests that Xodus' Motion For Summary Judgment be granted.

### ARGUMENT ON XODUS' PRIMA FACIE CASE

In its Response to Xodus' Motion, Wackenhut argues that Xodus should not have moved for summary judgment on Wackenhut's defense of undue hardship without establishing a prima facie case.  There is nothing improper about a plaintiff moving for summary judgment on a defense.  Furthermore,  Xodus has established his prima facie case in Xodus' Response to Wackenhut's Motion For Summary Judgment ("Wackenhut's Motion").

In its Response to Xodus' Motion, Wackenhut argues that Xodus failed to raise his religious accommodation claim at EEOC.  Xodus addressed this issue at pages 3-5 of Xodus' Response to Wackenhut's Motion.

In its Response to Xodus' Motion, Wackenhut argues that Xodus never requested a religious accommodation, and that "Plaintiff's vague suggestion that his dreadlocks are worn for 'religious reasons' is not – as a matter of law – sufficient to put Wackenhut on notice that Plaintiff is raising

---

[24] Wackenhut's "that's who we are" position is reminiscent of the defendant's position in <u>Carter v. Bruce Oakley, Inc.</u>, 849 F. Supp. 673 (E.D. Ark. 1993), where the Court entered judgment for Mr. Carter (Jewish) on his Title VII religious accommodation claims, because the employer had not shown that allowing Mr. Carter to wear a beard would be an undue hardship.  "In summary, the Court holds that the defendant has not demonstrated an undue burden it would have suffered had the plaintiff been allowed to wear his beard in his requested manner. The reasons offered by Oakley seem contrived and are not convincing.  The Court finds that one of the most revealing exchanges on the subject occurred when the defendant's president Dennis Oakley was directly asked why the company had the no-beard policy. *His answer was that his father had started it and the company was going to continue it.*  The Court concludes that the defendant simply did not want the plaintiff to wear his beard and constructively discharged him because of his refusal to comply with Oakley's employment requirement. The defendant did not meet its legal responsibility to attempt to accommodate the plaintiff's religious beliefs and practices." <u>Id</u>. at 676 (emphasis added).

and requesting some type of religious accommodation." Xodus addressed these issues at pages 5-8 of Xodus' Response to Wackenhut's Motion, where Xodus presented his prima facie case.

In its Response to Xodus' Motion, Wackenhut cites some cases to support its claim that Xodus was required to do more than inform Wackenhut that his religious practice conflicted with a job requirement; Wackenhut argues that Xodus was required to state the name of his religion, even though Wackenhut did not ask his religious affiliation. (Wackenhut's SOF ¶ 32, which Xodus admitted; ¶ 15 of Xodus' Statement of Additional Undisputed Material Facts in Response to Wackenhut's Motion, which Wackenhut did not admit or deny.)

None of the religious accommodation cases cited by Wackenhut in its Response to Xodus' Motion state that a plaintiff must tell a defendant the <u>name</u> of his religion in order to request a religious accommodation. These cases only state that a plaintiff seeking a religious accommodation must make clear he has a *religious practice* that conflicts with a work requirement.

Wackenhut cites <u>Reed v. Great Lakes Cos.</u>, 330 F.3d 931 (7th Cir. 2003), where Great Lakes fired Reed after Reed abruptly walked out of a business meeting with the Gideons without informing Great Lakes how participation in the meeting conflicted with his religion.

Reed brought *two types of religious discrimination claims*: a *religious disparate treatment* claim and a *religious accommodation* claim. The Seventh Circuit held that disclosure of Reed's actual faith was not necessary for Reed to prevail on either claim, but ruled for Great Lakes on other grounds.

In analyzing the *religious disparate treatment claim*, the Seventh Circuit stated, "It is difficult to see how an employer can be charged with discrimination on the basis of an employee's religion when he doesn't know the employee's religion (or lack thereof, which, as we have noted, is in the eyes of the law a form of religion), [citations omitted], though *the employee can survive summary judgment if, while declining to specify his religious beliefs, he attests that they differ from his employer's and that that is why he was fired*." <u>Id</u>. at 934 (emphasis added). Reed lost his religious disparate treatment claim because he wouldn't even attest at his deposition that his religious beliefs differed from his employer's religious beliefs, and that he was fired for that reason. "Oddly, Reed at his deposition refused to indicate what if any religious affiliation or beliefs (or nonbeliefs) he has; refused even to deny that he might be a Gideon!" <u>Id</u>. at 933.

In analyzing the *religious accommodation claim*, the Seventh Circuit stated, "There is a line, indistinct but important, between an employee who seeks an accommodation to his religious faith and an employee who asserts as Reed did an unqualified right to disobey orders that he deems

28

inconsistent with his faith *though he refuses to indicate at what points that faith intersects the requirements of his job*." Id. at 935 (emphasis added). Reed lost his religious accommodation case because he refused to say how his faith conflicted with the job.

Xodus' case is distinguishable from Reed in a few ways. First, Xodus brought only one type of religious discrimination claim, a *religious accommodation* claim. Second, Xodus did indicate precisely at what point his faith conflicted with the requirements of the job: his religious practice of wearing dreadlocks conflicted with Wackenhut's prohibition on dreadlocks.

Reed certainly doesn't stand for the proposition that an employee must mention the *name* of his religion to request a religious accommodation. In fact, the Seventh Circuit points out that it's not the name of the religion that matters in a religious accommodation case; it's the "beliefs and observances."

"Even if he wears a religious symbol, such as a cross or a yarmulka, this may not pinpoint his particular *beliefs and observances*; and anyway employers are not charged with detailed knowledge of the beliefs and observances associated with particular sects. Suppose the employee is an Orthodox Jew and believes that it is deeply sinful to work past sundown on Friday. He does not tell his employer, the owner of a hardware store that is open from 9 a.m. to 6 p.m. on Fridays, who leaves the employee in sole charge of the store one Friday afternoon in mid-winter, and at 4 p.m. the employee leaves the store. The employer could fire him without being thought guilty of failing to accommodate his religious needs. This case is similar." Id. at 936.

Using the Seventh Circuit's example, in order to request a religious accommodation, the Orthodox Jew was required to tell his employer that he couldn't work past sundown on Friday for religious reasons. Similarly, Xodus had to tell Wackenhut that he couldn't cut off his dreadlocks for religious reasons; and he did that. As soon as Xodus said that he couldn't cut off his dreadlocks for religious reasons, Wackenhut knew that there was a conflict between Xodus' religion and Wackenhut's prohibition on dreadlocks.

Next, Wackenhut cites Van Koten v. Family Health Mgmt., 955 F. Supp. 898 (N.D. Ill. 1997), which is a *religious disparate treatment case*, not a religious accommodation case. Van Koten never alleged that he was denied a religious accommodation; instead, he alleged that his employer fired him, because the employer was hostile to Wiccans. "In the instant case, Plaintiff does not allege that Defendants were unwilling to accommodate a religious practice. Rather, Plaintiff alleges that Defendants fired Plaintiff because of his religious beliefs. Consequently, the accommodation framework seems inapplicable." Id. at 901.

Perhaps Wackenhut is confused because, in <u>Van Koten</u>, the District Court initially laid out the prima facie case for a religious accommodation case (because 42 U.S.C. § 2000e(j) defines "religion" in terms of religious accommodations), but then contrasted that with the prima facie case in a religious disparate treatment case (or a "religious discharge case," as the District Court called it).

The District Court ultimately determined that the employer never knew that Van Koten was a Wiccan, so the employer couldn't have been hostile to him for being a Wiccan.

In affirming on other grounds, the Seventh Circuit questioned the District Court's ruling that Van Koten had to show that his employer knew he was a Wiccan. "The district court determined that Van Koten met each of the factors of the prima facie test except for the *newly added knowledge requirement*. Although the district court based its determination on the use of the above prima facie test, we need not consider if this is the appropriate test because 'we of course may affirm the judgment of the district court on any ground supported by the record.'" <u>Van Koten v. Family Health Mgmt.</u>, 1998 U.S. App. LEXIS 1837, *9 (7th Cir. 1998).[25] The Seventh Circuit held that Van Koten failed to show that the employer's legitimate, non-discriminatory reason for firing him (failure to follow procedures) was pretext.

Finally, Wackenhut cites <u>Kreilkamp v. Roundy's, Inc.</u>, 428 F. Supp. 2d 903, 906 (W.D. Wis. 2006), where the Court found that Kreilkamp failed to allege any conflict between a religious practice and his job. Kreilkamp simply refused to wear a gingerbread man necklace on the grounds that he didn't wear jewelry, and that one of his parents was part-Jewish. "He did not assert that his refusal to wear the necklace was based on a religious practice or belief." <u>Id</u>. at 906.

In contrast, Xodus did assert that his refusal to cut off his dreadlocks was based on a religious practice.

Furthermore, an employee does not even have to belong to an organized religion, with an actual *name*, to qualify for a religious accommodation. The EEOC's Guidelines on Discrimination Because of Religion, 29 C.F.R. § 1605.1 (emphasis added), states, "The fact that *no religious group* espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee." "Therefore, a religious belief does not have to be espoused by

---

[25] This unpublished opinion was cited in Wackenhut's Response To Xodus' Statement Of Additional Facts, and was provided to the Court in Wackenhut's Supplemental Appendix.

or accepted by any religious group to fall within the definition of 'religion' under Title VII." <u>Van Koten v. Family Health Mgmt.</u>, 955 F. Supp. 898, 902 (N.D. Ill. 1997).

Finally, in its Response to Xodus' Motion, Wackenhut argues that Wackenhut "raised a possible accommodation with Plaintiff but that Plaintiff then aborted the interview and precluded any accommodation process." Xodus addressed this at pages 10-11 of Xodus' Response to Wackenhut's Motion. Furthermore Wackenhut should be deemed to have admitted that Wackenhut terminated the interview. ¶ 15 of Xodus' Statement Of Additional Material Facts states in part, "But Wackenhut simply terminated the interview when Xodus stated he could not comply with the grooming policy for religious reasons. (Xodus Tr. 219.)" Wackenhut did not admit or deny ¶ 15.

WHEREFORE, Xodus respectfully requests that Wackenhut's Motion For Summary Judgment be denied, and that Xodus be granted Summary Judgment on those parts of Wackenhut's Motion where Wackenhut has not met its burden.

Respectfully Submitted,

<u>/s/ Kamran Memon</u>
Plaintiff's Attorney

Kamran Memon
200 S. Michigan Ave.
Suite 1240
Chicago, IL 60604
(312) 961-2354

31

## CERTIFICATE OF SERVICE

I served Plaintiff's Reply To Wackenhut's Response To Plaintiff's Motion For Partial Summary Judgment on February 27, 2009 through the Court's electronic case filing system upon:

Erin D. Foley, Esq.
Seyfarth Shaw
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577

/s/ Kamran Memon
Kamran Memon